**Luis REYES, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

**Nos. 149,2002, 171,2002.**

Supreme Court of Delaware.

Submitted: Dec. 10, 2002.

Decided: March 25, 2003.

Jerome M. Capone (argued), and Thomas A. Pedersen, Wilmington, for Appellant.

William M. Kelleher (argued), Department of Justice, Wilmington, for Appellee.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER and STEELE, Justices, constituting the Court en Banc.

HOLLAND, Justice:

This is the defendant-appellant Luis E. Reyes' direct appeal from his judgments of conviction and death sentence for the murders of Brandon Saunders and Vaughn Rowe.[1] A Superior Court jury convicted Luis E. Reyes of two counts of Murder in the First Degree, two counts of Possession of a Deadly Weapon during the Commission of a Felony, and two counts of Conspiracy in the Second Degree. During the

1. Reyes' direct appeal and his automatic appeal to this Court have been consolidated.

penalty hearing, the jury voted nine to three to recommend a death sentence. The trial judge sentenced Reyes to death.

Reyes argues that the Superior Court abused its discretion in refusing to allow open-ended questioning of jurors during *voir dire* regarding their views on the death penalty. Reyes also contends that the Superior Court erred in several evidentiary rulings and in denying his motion for a mistrial on the basis of two separate instances of alleged juror misconduct. Finally, Reyes challenges the constitutionality of the 1991 Delaware death penalty statute.

After carefully reviewing the record and considering Reyes' claims of error, we have determined that the trial judge exercised his discretion properly in conducting *voir dire*, in ruling on the evidentiary issues presented, and in denying Reyes' motions for a mistrial. We also hold that the 1991 Delaware death penalty statute, as applied to Reyes, is constitutional. Finally, we have concluded that the imposition of the death sentence is proportionate. Accordingly, the Superior Court's judgments of conviction and the imposition of Reyes' death sentence are affirmed.

### *Facts*

Reyes, and his co-defendant, Luis Cabrera, were charged with the murders of Vaughn Rowe and Brandon Saunders. The murders occurred on January 20, 1996. The defendants were not arrested until 1999. The cases were severed and the defendants were tried separately. Cabrera went to trial first and was convicted, as charged, and sentenced to death.

Early in the morning of January 21, 1996, the bodies of two teenagers were discovered by a passerby in a wooded section of Rockford Park in Wilmington. The bodies of Vaughn Rowe and Brandon Saunders were in a shallow grave that was covered by a maroon bed sheet. Rowe and Saunders had, according to expert testimony, been killed about twelve to eighteen hours before their bodies were discovered.

Both teens had been shot in the back of the head. Rowe also had internal injuries to his spleen, liver and left kidney as well as facial lacerations. The additional injuries suffered by Rowe were consistent with the repeated use of blunt force. Some of the injuries were inflicted by a belt buckle.

The police recovered several pieces of evidence at the scene including bullets, four small bags of marijuana found in the victim Rowe's clothes, and a watch Rowe was wearing that had a memory bank of telephone numbers. The memory bank listed a telephone number that corresponded with the residence of Luis Cabrera's father.

At the victim Saunders' home, the police also recovered a business card for "ISS Servicesystem, Inc." Handwritten on the card was "434–6154 Big Lou." Both Cabrera and Reyes worked at ISS and some people referred to Cabrera as "Big. Louie" and Reyes as "Little Louie."

In March 1996, the police learned that the bullet, which killed Vaughn Rowe, came from a 38–caliber gun. The bullet had certain identifiable markings on it. A year later, in March 1997, police were investigating the unrelated murder of a man named Fundador Otero, who was killed in January 1995. As part of that investigation, the police conducted two searches at Luis Cabrera's father's house. During that search, they found a 38–caliber pistol and a single maroon fitted bed sheet. When the 38–caliber pistol was test fired, the test bullet had markings almost identical to the bullet found in Vaughn Rowe's head.

On or about January 20, 1998, the police interviewed Roderick Sterling, an inmate at Gander Hill prison. Sterling advised the police that he had overheard Reyes having conversations with Ivan Galindez, who was Sterling's cellmate. At the time of those conversations, Reyes was also incarcerated at the Gander Hill prison, serving a twelve-year sentence for the Otero murder.

Sterling heard Reyes admit to Galindez his involvement in the Saunders–Rowe double murder, along with a man named Luis Cabrera. Sterling testified that he had overheard Reyes tell Galindez that Rowe and Saunders had "shorted" Cabrera on a marijuana deal. Sterling also stated that Reyes said he beat someone with a belt in the basement of a house at "601 something." He also heard Reyes say that a neighbor came down during the beating because there was so much noise coming from the basement.

Sterling heard Reyes recount to Galindez how he and Cabrera decided to take the person they were beating from the basement to a park. The victim was transported in the trunk of a black BMW.[2] Reyes and Cabrera then picked up the second victim so that they could kill both of them at the same time. Sterling heard Reyes say that once he and Cabrera picked up the second victim, they went to Canby Park. Arriving there, they made both of the victims lie on the softball field and shot them. The bodies were then taken to Rockford Park and left there.

At the time of the murders, Cabrera and Reyes lived together at 610 W. 20th Street in a three-story house. Cabrera and Reyes lived on the second floor. The tenant on the first floor was Donna Ashwell.

Clavel Clamamont and Maribel Skjefte lived on the third floor.

Following Sterling's interview, the police located the female tenants of Reyes' former apartment building, Donna Ashwell and Maribel Skjefte. Although they were interviewed two and a half years after the murders, the women remembered a fight in the basement. Donna Ashwell remembered that the fight occurred just a day or two before the two bodies were found in Rockford Park. The women recalled hearing the voices of Luis Cabrera and Luis Reyes during the fight. They also heard the voice of a third person, which they did not recognize.

At trial, both Ashwell and Skjefte testified. Ashwell recalled that on a Saturday night in January 1996, she heard what she described as a fight in the basement of her building. Ashwell also heard an argument. One voice, which sounded like that of Cabrera, asked another person a question. After a negative response to the question, Ashwell heard a metal crashing noise. Ashwell then went to the basement and banged on the door. Reyes came to the door and Ashwell said to him, "Take the fight elsewhere or I'll call the police." Reyes asked her not to do that and told her they would take the fight elsewhere.

Skjefte testified that she went down to the basement shortly after Ashwell did. She stated that Cabrera answered the door and told her they were taking care of some business. Skjefte also heard Reyes' voice. Shortly thereafter, Cabrera came into the first floor foyer. He apologized to the women and said they were leaving.

Several items of physical evidence linked Rowe and Saunders to Cabrera, albeit indirectly. The first item was a watch that

---

**2.** Other witnesses corroborated that Cabrera owned a black BMW at the time of the murders.

Rowe was wearing at the time of his death. That watch had a memory bank of phone numbers, one of which was for a woman. That telephone number was for the Wilmington residence of Luis Cabrera's father, Luis Cabrera, Sr. The second item of evidence was an ISS Servicesystem, Inc. business card found at the Saunders family home. On it was written a telephone number and the words "Big Lou." Both Cabrera and Reyes worked at ISS and were known as "Big Louie" and "Little Louie,"

On February 3, 1996, shortly after the murders, Cabrera returned Saunders' pager to a Page One store in Wilmington. The pager was identified as Saunders' by a code number inside it. Page One does not generally give receipts for returned pagers, however, when Cabrera returned Saunders' pager, he also bought a new one, generating a receipt. Cabrera's name and address appear on the back of the receipt.

Cabrera's estranged wife testified for the State at Reyes' trial. She stated that they had both worked for a cleaning service that was located on Silverside Road. The business card with "Big Lou" on it found in Saunders' bedroom had a Silverside Road address. Cabrera's wife also testified that she had owned a set of bed sheets that were similar to the single maroon sheet that was found covering the victim's bodies. When she separated from Cabrera, she left the maroon sheets behind for Cabrera. When police searched Mr. Cabrera Sr.'s house, they found a maroon sheet on the floor in a pile of laundry. Mr. Cabrera Sr. said it was his son's sheet. Both the sheet found during the search and the one covering the bodies had nearly identical labels.

Another inmate at the Gander Hill prison, Waymond Wright, testified Reyes told him that he had gone to school with Saunders and Rowe. Wright testified that Reyes told him that after the murder several classmates hugged Reyes. Commenting on this, Reyes told Wright, "if they only knew." Wright also testified that when Reyes admitted to the murders, he said the victims were "short" on a pound of marijuana. Wright's testimony about Reyes' account of how the murders were committed was similar to the events attributed to Reyes by Sterling's testimony.

### Open Ended Voir dire Discretionary

■ *Voir dire* is critical to protecting a defendant's Sixth Amendment right to a fair trial by an impartial jury.[3] *Voir dire* is the historic method used in the United States to identify bias in prospective jurors.[4] The purpose of the *voir dire* is to ensure the selection of qualified jurors who have no bias or prejudice that would prevent them from returning a verdict based on the law and the evidence that is admitted during trial.[5]

Reyes' first argument on appeal is that he should have been allowed to conduct open-ended *voir dire* during jury selection in this capital murder case. This Court has previously ruled on the issue of whether open-ended *voir dire* should be required for jury selection in death penalty cases. We have held that "although open-ended [*voir dire*] questions may be preferable, they are not [constitutionally] required." [6]

**3.** *Morgan v. Illinois,* 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992); *Rosales–Lopez v. U.S.,* 451 U.S. 182, 188, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981).

**4.** *United States v. Burr,* 25 F.Cas. 49, 51 (C.C.D.Va.1807).

**5.** Edward J. Devitt et al., Federal Jury Practice and Instructions § 3.01 (3d ed.1999).

**6.** *Barrow v. State,* 749 A.2d 1230, 1237 (Del. 2000). *See also Manley v. State,* 709 A.2d 643, 655 (Del.1998).

The record reflects that the trial judge was acting within his discretion when he denied Reyes' request to allow open-ended *voir dire* questions during jury selection.

### Reyes Prior Testimony

■ On January 5, 1997, Reyes pled guilty to Murder in the Second Degree and other criminal offenses. Those charges related to a different homicide: the murder of Fundador Otero on January 5, 1995 in the City of Wilmington. As part of the plea agreement, Reyes agreed to testify for the prosecution against Cabrera, who was also Reyes' co-defendant with regard to the murder of Fundador Otero.

In this appeal, Reyes' second argument is that the trial judge abused his discretion in admitting a portion of the testimony given by Reyes during his cross-examination in Cabrera's trial for the murder of Fundador Otero. In particular, Reyes objects to the introduction of the following testimony from the Otero case:

> Q. [Prosecutor] Okay. And you don't recall telling your girlfriend that or do you recall telling your girlfriend that you were with Luis and somebody came over to the house and you went down the basement and beat them up?
>
> A. [Reyes] I don't recall telling her that. Not that moment. I told her that another time.

Reyes challenges the general relevance of his statement to Santos, Reyes' girlfriend, under D.R.E. 402. Alternatively, Reyes contends that it was error under D.R.E. 403 for the judge to admit into evidence that portion of his prior testimony from the Otero trial.

Delaware Rule of Evidence 402 provides that "all relevant evidence is admissible."[7] Relevant evidence, as defined under Rule 401, is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[8] Pursuant to D.R.E. 403, even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury...."[9] The appellate standard of review in determining whether a trial judge should have admitted or excluded otherwise relevant evidence pursuant to D.R.E. 403 is abuse of discretion.[10]

Reyes contends that his statement at Cabrera's trial for Otero's murder is too vague in time and place to be relevant to the murders at issue in this trial. The record reflects that Reyes' statement during the prior trial was corroborated by Santos's independent statement to the police. Santos placed both Reyes and Cabrera in the basement of Cabrera's apartment participating in the beating of another person. Reyes' arguments, suggesting that there was no temporal connection between his testimony at the prior trial and the murders of Rowe and Saunders, go to the weight of that evidence rather than its admissibility. The record supports the trial judge's determination that Reyes' statement at the prior trial qualified as relevant evidence in this case under Rule 402.[11]

■ After determining that Reyes' prior testimonial statement was relevant under D.R.E. 402, the trial judge was called upon

---

**7.** Del. R. Evid. 402.

**8.** Del. R. Evid. 401.

**9.** Del. R. Evid. 403.

**10.** *Virdin v. State,* 780 A.2d 1024, 1030 (Del. 2001).

**11.** *See Lampkins v. State,* 465 A.2d 785, 790 (Del.1983).

under D.R.E. 403 to weigh the potential probative value of the statement to the State's case against the possible unfair prejudice that evidence could cause to Reyes.[12] The record supports the trial judge's determination that the probative value of Reyes' statement to the State's circumstantial case was significant. The evidence was not *unfairly* prejudicial to Reyes. Accordingly, we hold that the trial judge acted within his discretion by admitting into evidence Reyes' testimonial statement from Cabrera's prior trial.

### Co–Conspirator Statements

■ The third issue raised by Reyes on appeal is that the trial judge abused his discretion by admitting into evidence two statements attributed to Luis Cabrera by Ms. Skjefte.[13] The trial judge ruled that Reyes and Cabrera were co-conspirators. The statements attributed to Cabrera by Ms. Skjefte were admitted into evidence against Reyes as statements by a co-conspirator.

There are two statements that were introduced into evidence by the State that are in dispute. Cabrera made the first statement in response to an inquiry from Ms. Skjefte when she heard a commotion in the basement of her living complex. According to Skjefte, Cabrera said, "nothing [is going on]. We're taking care of some business; I'll explain later." A few days later, after the completion of the murders, Ms. Skjefte asked Cabrera what had taken place in the basement. Cabrera responded, "well you know, that boy was messing with—messing around with my boy's girl. So we had to teach him a lesson."

Delaware Rule of Evidence 802 provides that hearsay evidence is inadmissible unless permitted by law or the Rules.[14] Delaware Rule of Evidence 801(d), however, states, "A statement is not hearsay if: ... (2) ... The statement is offered against a party and is ... (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy; provided that the conspiracy has first been established by the preponderance of the evidence ...."[15] A statement qualifies as an exception under 801(d)(2)(E) if the offering party can show, by a preponderance of the evidence,[16] that: first, a conspiracy existed; second, the co-conspirator and the defendant against whom the statement is offered were members of the conspiracy; and third, the statement was made in the course of and in furtherance of the conspiracy.[17] Reyes does not contend the State did not prove the first two qualifications but rather argues there was no proof the statements were in furtherance of the conspiracy.

■ Generally, a conspiracy terminates upon accomplishment of the principal objective unless evidence is introduced indicating that the scope of the original agreement included acts taken to conceal the criminal activity.[18] Reyes' contends that

---

12. *Williams v. State*, 494 A.2d 1237, 1241 (Del.1985) (citing *Rush v. State*, 491 A.2d 439 (Del.1985)); *see also* Del. R. Evid. 401, 402, 403.

13. *See McGriff v. State*, 781 A.2d 534, 537 (Del.2001) (citing *Feleke v. State,* 620 A.2d 222, 225 (Del.1993)).

14. Del. R. Evid. 802.

15. Del. R. Evid. 801(d)(2)(E).

16. Del. R. Evid. 801(d)(2)(E); *Lloyd v. State,* 534 A.2d 1262, 1264 (Del.1987).

17. *Harris v. State*, 695 A.2d 34, 42 (Del.1997) (quoting *Lloyd v. State,* 534 A.2d 1262, 1264 (Del.1987)).

18. *See id.* at 42 & n. 25 (holding that a statement intended to conceal a crime furthered the conspiracy).

the statements attributed to Cabrera did not further either the completion of the conspiracy or the concealment of criminal activity. Therefore, Reyes argues the admission of Ms. Skjefte's testimony constituted reversible error. The State asserts that the duration of a conspiracy depends on the fact-specific scope of the original agreement and, in this case, included the assault that preceded the actual murders and acts to conceal the murders.

The State's position is supported by the record. Cabrera made the first statement to Skjefte in furtherance of concealing the crimes in progress so that the objective of the conspiracy could be completed without detection. Cabrera's second statement to Skjefte was intended to conceal the involvement of Cabrera and Reyes in the completed murders. The record supports the trial judge's factual determinations and rulings that both of Cabrera's remarks were admissible against Reyes as the statements of a co-conspirator.[19]

### Victim's State of Mind

■ Robbi Jones testified that one of the victims, Saunders, told Jones that he was going to meet someone from the wrestling team on the night he was killed. After giving this information to police investigators, Jones examined some police photographs and identified Luis Reyes, as the individual from the wrestling team. Jones told the police he thought Reyes' name was "Alex."

■ Reyes fourth argument on appeal is that the trial judge's decision to admit the testimony of Robbi Jones regarding Saunders' state of mind on the night of his murder was erroneous. Delaware Rule of Evidence 803(3) provides a hearsay exception for a present sense impression state of mind.[20] Rule 803(3) provides that:

> [a] statement of the declarant's then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification or terms of the declarant's will.[21]

The state of mind exception to the hearsay rule is a venerable evidentiary precept.[22] In fact, it is "firmly rooted for purposes of the Confrontation Clause."[23]

■ In *Derrickson v. State*,[24] this Court identified five factors that need to be satisfied before a statement will be admitted as a present sense impression under state of mind exception to the hearsay rule.[25] First, the statement must be relevant and material.[26] Second, the statement must relate to an existing state of mind when made.[27] Third, it must be made in a natural manner. Fourth, it must be made under circumstances dispelling suspicion.[28] Fifth, it must contain no suggestion of

---

19. *See id.*

20. Del. R. Evid. 803(3).

21. *Id.*

22. *Capano v. State,* 781 A.2d 556, 616 (Del. 2001).

23. *Id.* (internal quotes omitted).

24. *Derrickson v. State,* 321 A.2d 497 (Del. 1974).

25. *Id.* at 503.

26. *Id; see also Forrest v. State,* 721 A.2d 1271, 1275–76 (Del.1999).

27. *Id.*

28. *Id.*

sinister motives.[29]

■ In *Capano v. State*[30], applying *Derrickson*, this Court distinguished such "[d]eclarations of intention, casting light upon the future, ... from declarations of memory pointing backwards to the past."[31] While a declaration of past events is generally not admissible, a declaration of future intention is admissible.[32] Jones testified about Saunders' statement that he planned to go meet Luis Reyes the evening he was killed—Saunders' intentions regarding the future.

Jones testified that he had a telephone conversation with the decedent, Saunders, prior to Saunders' death. During the conversation, Saunders told Jones he planned to meet that Saturday night "with the short wrestler with the glasses." Jones also stated that he did not recall Saunders giving that person's name. Jones told the police he thought the person described by Saunders was named "Alex." When the police asked Jones to look at some photographs to identify the person he thought Saunders was describing, Jones identified Reyes.

Reyes argues that because Saunders indicated the person's name was Alex the statement was not relevant. The record reflects that Saunders never told Jones the person's name was Alex. Rather, Saunders described the person to Jones. Jones mistakenly thought Reyes' name was Alex. Jones knew to whom Saunders was referring physically because he was able to identify him in the police photographs.

In this case, Jones's testimony meets the five-factor test set forth in *Derrickson v.* *State*[33] and is consistent with the distinction recognized in *Capano v. State*.[34] The plans that Saunders related to Jones suggested that he would be in Reyes' presence the night of the murders. Jones's testimony about Saunders' statement related to the existing state of mind of Saunders at the time of its making and was communicated in a natural manner. The statement was made under a circumstance dispelling suspicion. It contained "no suggestion of sinister motives."

The testimony by Jones about the Saunders' self-described plans for the evening of his disappearance was material and relevant evidence at the trial of the victim's alleged killer. The trial judge properly permitted Jones's testimony under the state of mind hearsay exception in D.R.E. 803(3) and gave an appropriate limiting instruction. Reyes' arguments to the contrary are without merit.

### Alleged Juror Misconduct

■ After the testimony of Robbi Jones, juror number Fourteen notified the trial judge that some members of the jury had engaged in discussions regarding Jones's testimony. According to juror Fourteen, another juror stated that Jones "looked as if he could kill [Reyes]." Juror Fourteen added that the second juror allegedly responded by saying something similar to "I can see why." According to juror Fourteen, another juror immediately reminded them not to talk about the case and the conversation ended.

The trial judge promptly notified counsel about juror Fourteen's assertions. The

29. *Id.*

30. *Capano v. State*, 781 A.2d 556 (Del.2001).

31. *Id.* at 608.

32. *See, e.g., id.*

33. *Derrickson v. State*, 321 A.2d 497, 503 (Del. 1974).

34. *Capano v. State*, 781 A.2d 556, 608 (Del. 2001).

trial judge engaged in an individual *voir dire* of juror Fourteen as well as all of the remaining jurors.[35] The responses among the jurors varied. Several jurors indicated they heard something similar to that reported by juror number Fourteen. Other jurors heard nothing at all. In the course of the individual *voir dire* of each juror, one juror also reported that an unidentified female juror had stated that Jones had lied in the past. That conversation also ended abruptly because another juror reminded all those within earshot not to discuss the case.

 During the individual *voir dire*, all of the jurors asserted that they would be able to continue the trial in an unbiased manner. At the conclusion of the *voir dire*, Reyes' defense attorney moved for a mistrial. The motion was denied. The judge gave the entire jury a comprehensive explanation about the importance of assiduously adhering to the court's instructions not to discuss the case at all with anyone until the time of deliberation.[36] Absent egregious circumstances that are inherently prejudicial, a defendant must prove actual prejudice resulted from juror misconduct before a mistrial is mandated.[37]

The brief discussions by the jurors in this case do not constitute an egregious circumstance *per se*, and Reyes has not shown any actual prejudice. The record reflects that after interviewing the jurors and instructing them carefully, the trial judge properly exercised his discretion in denying Reyes' motion for a mistrial.

### Jury Deliberations Untainted

After the penalty hearing was completely finished, an alternate juror spoke about the deliberations with one of the jurors. From that conversation, the alternate juror concluded that the jury had access to material during its deliberations that had not been admitted into evidence.[38] This was reported to the trial judge.

 An essential ingredient of the right to trial by jury is for jury verdicts to be based solely on the evidence presented at trial.[39] "The accused's rights to confrontation, cross-examination and the assistance of counsel assure the accuracy of the testimony which the jurors hear and safeguard the proper admission of other evidence."[40] Those rights can be exercised effectively only if evidence is presented to the jury in the courtroom.[41]

**35.** *See Diaz v. State*, 743 A.2d 1166, 1180 (Del.1999) (no inquiry of jurors and no curative action contributed to reversible error).

**36.** *See Diaz v. State*, 743 A.2d 1166, 1180 (Del.1999) (no individual or collective instructions to the jury contributed to reversible error).

**37.** *Massey v. State*, 541 A.2d 1254, 1259 (Del. 1988) (citations omitted).

**38.** *Flonnory v. State*, 778 A.2d 1044, 1052 (Del.2001) (stating that an "essential ingredient of this right is for jury verdicts to be based solely on the evidence presented at trial") (citing *Hughes v. State*, 490 A.2d 1034, 1040 (Del.1985); *see also Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) and *In re Oliver*, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948)).

**39.** *Flonnory v. State*, 778 A.2d 1044, 1052 (Del.2001) (stating that an "essential ingredient of this right is for jury verdicts to be based solely on the evidence presented at trial") (citing *Hughes v. State*, 490 A.2d at 1040 (Del.1985); *see also Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); and *In re Oliver*, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948)).

**40.** *Flonnory v. State*, 778 A.2d 1044, 1052 (Del.2001) (citing *Smith v. State*, 317 A.2d 20, 23 (Del.1974)); *Turner v. Louisiana*, 379 U.S. 466, 472–73, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965).

**41.** *Id.*

The trial judge conducted a hearing on two separate days. He questioned both the alternate juror and the deliberating juror with whom she had spoken. The deliberating juror explained that the there was no material in the jury room that had not been admitted into evidence. According to the juror, the alternate juror's confusion may have originated from the fact that at least one videotape, that was shown only in part at trial in order to conserve time, was viewed in its entirety by the jury during deliberations. The alternate juror agreed with the juror's characterization of their conversation.

■ The trial judge concluded that no material had been viewed by the jury during deliberations that had not been admitted into evidence during trial. Under the facts of this case, there was no need to question all twelve of the jurors individually. The judge acted properly in immediately investigating and resolving the issue when it came to his attention. The record supports the trial judge's conclusion.

### 1991 Death Penalty Statute Constitutional

■ Reyes was sentenced under the 1991 version of Section 4209. Reyes' final argument is that the United States Supreme Court's decision in *Ring v. Arizona*[42] rendered the 1991 version of Delaware's death penalty statute, title 11, section 4209 of the Delaware Code, unconstitutional. In *Brice v. State*,[43] this Court recently addressed several questions concerning the 2002 amendment to Section 4209. The rationale for our "narrowing" phase holding in *Brice* controls our disposition of Reyes' specific challenge to the 1991 Delaware death penalty statute.

In *Brice*, we held that *Ring* only extends to the so-called "narrowing" phase of the sentencing process.[44] Accordingly, once a jury finds, unanimously and beyond a reasonable doubt, the existence of at least one statutory aggravating factor, the defendant becomes death eligible.[45] In *Brice*, this Court held that a jury finding during the guilt phase of the existence of the underlying facts that are necessary to establish a statutory aggravator beyond a reasonable doubt complied with the construction of the United States Constitution in *Ring*.[46]

The record reflects that *Ring*'s constitutional requirement of such fact-finding by a jury is satisfied in Reyes' case. The jury convicted Reyes of, among other crimes, two counts of Murder in the First Degree under Section 636(a)(1). Multiple convictions under Section 636(a)(1), resulting from a single course of conduct, establish the existence of a statutory aggravator under Section 4209(e)(1)(k). The statutory aggravator in Section 4209(e)(1)(k) is described as follows: "[t]he defendant's course of conduct resulted in the deaths of [two] or more persons where the deaths are a probable consequence of the defendant's conduct."

■ The jury's finding of the statutory aggravator described in 4209(e)(1)(k) complies with the holding in *Ring*. The jury's verdict that Reyes was guilty of committing two counts of Murder in the First Degree during a single course of conduct established the existence of the statutory

---

**42.** *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

**43.** *Brice v. State,* 815 A.2d 314 (Del.2003).

**44.** *Id.*

**45.** *Id.*

**46.** *Id.; Accord Norcross v. State,* 816 A.2d 757 (Del.2003).

aggravating "narrowing" circumstance, which made Reyes "death eligible." Such a finding during the guilt phase of Reyes' trial was made by the jury unanimously and beyond a reasonable doubt. When the very nature of a jury's guilty verdict simultaneously establishes the statutory aggravating circumstance set forth under Section 4209(e)(1)(k), that jury verdict authorizes a maximum punishment of death in a manner that comports with the United States Supreme Court's holding in *Ring*.[47] Therefore, we hold that the 1991 version of Section 4209, as applied to Reyes, is constitutional.

### Independent Review of Sentence

■ Pursuant to title 11, section 4209(g)(2) of the Delaware Code, this Court conducts an independent review of any death sentence imposed by the Superior Court. The purpose of the review is to determine whether: (i) the evidence supports the finding of at least one statutory aggravating circumstance; (ii) the death penalty was imposed arbitrarily or capriciously; and (iii) the sentence is disproportionate when compared to similar cases arising under the statute. This Court recognizes the importance of its statutory responsibility, because "death as a punishment is unique in its severity and irrevocability."[48]

### Statutory Aggravators

■ The State alleged that the applicable statutory aggravating circumstance in this case was that two murders were committed by the Defendant, Luis E. Reyes.[49] The jury convicted Reyes of two separate charges of Murder in the First Degree based on his role in the murders of

Vaughn Rowe and Brandon Saunders. Reyes does not argue that the evidence was insufficient to support the jury's verdicts.

### Sentence Not Arbitrary or Capricious

The trial judge carefully considered the aggravating and mitigating circumstances and the jury's nine to three recommendation to impose the death penalty. The mitigating circumstances included the fact that Reyes was 18 when Rowe and Saunders were murdered. Reyes also presented evidence of the significant dysfunctional circumstances of his childhood and the lack of a father's support in any respect. According to Reyes, that background, coupled with his age, made him vulnerable to an older male figure, Cabrera. Reyes also presented evidence in mitigation that he has adjusted well to prison life, that he loves his daughter and is supportive of her half brother.

The trial judge weighed these mitigating circumstances against the aggravating circumstances. At age seventeen, Reyes participated in the murder of Fundador Ortero, holding him still while Luis Cabrera suffocated him. Reyes is serving a sentence pursuant to a guilty plea for his role in the Ortero murder. The victims in this case, Rowe and Saunders, were killed only a year after the Ortero murder. Rowe and Saunders were both executed. They were shot in the back of the head in cold blood because they "shorted" Cabrera one pound of marijuana in a drug transaction. Thus, Reyes has now killed or assisted in the murders of three people.

The trial judge found that the aggravating circumstances far outweighed the mit-

**47.** *Accord Norcross v. State,* 816 A.2d 757 (Del.2003).

**48.** *Sullivan v. State,* 636 A.2d 931, 948 (Del. 1994) (citations omitted), *cert denied,* 513 U.S. 833, 115 S.Ct. 110, 130 L.Ed.2d 57 (1994).

**49.** Del.Code Ann. tit. 11, § 4209(e)(1)(k).

igating circumstances. That finding is supported by the record. The trial judge's decision to impose the death penalty was neither arbitrary nor capricious.

### Proportionality Review

The final aspect of this Court's statutory review is the determination of proportionality. The Court compares this case to the "universe" of death penalty cases to determine whether the imposition of Reyes' death penalty is proportionate.[50] In performing this task, the Court recognizes that a "definitive comparison of the 'universe' of cases is almost impossible."[51] "[S]entencing decisions involve difficult and uniquely human judgments that defy codification and that buil[d] discretion, equity, and flexibility into a legal system."[52]

"Recognizing these limitations, this Court looks to the factual background of relevant cases to determine the proportionality of the sentence imposed."[53] In making a determination of proportionality this Court has compared Reyes' sentence with the penalties imposed in all First Degree Murder cases which have "included a death penalty hearing, and have con-sidered objective factors such as the gravity of the offense, the circumstances of the crime, and the harshness of the penalty."[54]

Reyes, like several other defendants sentenced to death in Delaware, was found guilty of killing multiple victims. Reyes, like others sentenced to death in Delaware, was found guilty of Murder in the First Degree of two defenseless individuals that were killed in a cold-blooded execution style murder. Therefore, Reyes' case is substantially similar to other Delaware cases where the death penalty was imposed.[55] Accordingly, we conclude that Reyes' death sentence is proportionate.

### Conclusion

The judgments of conviction in the Superior Court and the sentencing of Luis E. Reyes to death for the murders of Brandon Saunders and Vaughn Rowe are affirmed. This matter is remanded to the Superior Court for further proceedings in accordance with the opinion.

---

**50.** Cases governed by the 1991 amendment to Section 4209 are most persuasive, but earlier cases may still be considered. *Lawrie v. State,* 643 A.2d 1336, 1350 (Del.1994), *cert denied,* 513 U.S. 1048, 115 S.Ct. 646, 130 L.Ed.2d 551 (1994).

**51.** *Pennell v. State,* 604 A.2d 1368, 1376 (Del. 1992) (citations omitted).

**52.** *Wright v. State,* 633 A.2d 329, 342–343 (Del.1993) (internal quotation omitted.).

**53.** *Clark v. State,* 672 A.2d 1004, 1010 (Del. 1996) (citing *Shelton v. State,* 652 A.2d 1 (Del.1995)).

**54.** *Sullivan v. State,* 636 A.2d 931, 950 (Del. 1994) (citing *Red Dog v. State,* 616 A.2d 298, 311 (Del.1992) (citing *Solem v. Helm,* 463 U.S. 277, 290–292, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983))).

**55.** *Cf. Post–1991 cases: Clark v. State,* 672 A.2d 1004 (Del.1996) (execution of adoptive mother and father for money); *Weeks v. State,* 653 A.2d 266, 274 (Del.1995) (two victims killed in "cold-blooded, calculated execution style manner."); *Lawrie v. State,* 643 A.2d 1336, 1340 (Del.1994) (woman and three children killed by arson); *Red Dog v. State,* 616 A.2d 298 (Del.1992) (five deaths during the course of lengthy criminal career); *Pennell v. State,* 604 A.2d 1368, 1375 (Del.1992) (four female victims of serial killer). *See also Pre–1991 cases: Deputy v. State,* 500 A.2d 581, 602 (Del.1985) (elderly couple stabbed to death in botched robbery); *Bailey v. State,* 503 A.2d 1210, 1211 (1984) (elderly couple shot in home invasion without provocation) and *Bailey v. State,* 490 A.2d 158, 173 (Del.1983); *Flamer v. State,* 490 A.2d 104, 123–24 (Del. 1983) (co-defendant of Deputy, murdered elderly couple in botched robbery).