Milton E. TAYLOR, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Nos. 321 & 344, 2001.

Supreme Court of Delaware.

Submitted: Nov. 4, 2002.
Decided: April 30, 2003.
On Motion For Reargument
May 14, 2003.

Bernard J. O'Donnell, Esquire (argued) and Todd E. Conner, Esquire, Assistant Public Defenders, Office of the Public Defender, Wilmington, Delaware, for Appellant.

Timothy J. Donovan, Jr., Esquire (argued), Thomas E. Brown, Esquire, and Elizabeth R. McFarlan, Esquire, Deputy Attorneys General, Department of Justice, Wilmington, Delaware, for Appellee.

* Sitting by designation pursuant to Del. Const.

Before VEASEY, Chief Justice, WALSH, HOLLAND, and STEELE, Justices and HARTNETT, Justice, (Retired),* constituting the Court En Banc.

WALSH, Justice.

This is an appeal from the Superior Court following the imposition of a death sentence. The appellant, Milton Taylor ("Taylor"), was convicted of Murder in the First Degree for causing the death of his girlfriend, Theresa Williams ("Williams" or the "Victim"). During the penalty phase of the trial, the jury unanimously found the existence of two aggravating factors: that the Victim was pregnant, and that Taylor had previously been convicted of violent felonies. The jury determined by a vote of ten to two that the aggravating circumstances outweighed the mitigating circumstances. The trial judge concurred with the jury's determinations and sentenced Taylor to death. This appeal followed.

Taylor raises three issues in this appeal. First, Taylor claims that the unfolding and reading of a confession letter, discovered during an inventory search, violated his rights under the Fourth and Fourteenth Amendments of the United States Constitution. Next, Taylor asserts that the United States Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), rendered Delaware's death penalty statute unconstitutional, and as such, his death sentence must be reversed. Finally, Taylor argues that the imposition of the death sentence in this case was disproportionate to similar sentences in similar cases. We find that Taylor's claims of error lack merit, and accordingly, we affirm the conviction and sentence.

art. IV, § 38 and 29 *Del. C.* § 5610.

## I.

On the morning of March 23, 2000, Steven Butler ("Butler"), a maintenance worker at the Compton Townhouse complex in Wilmington, was awaiting the arrival of some contractors when he discovered two unattended children playing in the courtyard. He recognized the children, ages two and four, as those belonging to Williams.[1] Before he left to supervise the contractors, Butler instructed the children to stay away from the street until their mother came outside to join them.

Williams and her sister, Tawana Ricks ("Ricks"), previously planned to do some shopping together that morning, but Williams never arrived at the predetermined location. When Ricks could not reach her sister by telephone she decided to visit Williams' home. Ricks arrived at the Compton Townhouse complex and discovered her sister's two youngest children, unsupervised and playing in the vicinity of her sister's home. As Ricks was knocking on the locked door to Williams' home, Nathaniel Henry ("Henry"), Williams' uncle, arrived to deliver some furniture. Ricks and Henry grew increasingly concerned as their attempts to locate Williams failed.

Butler then joined Ricks and Henry. Upon Ricks' urging, Butler agreed to open Williams' door. Once inside, Butler and Henry discovered Williams' badly beaten and bloody body concealed beneath a blanket with a bicycle on top. Williams was bleeding from her nose and had a cord wrapped around her neck. Williams was not breathing and Butler called 911. Williams was pronounced dead at the scene. An autopsy later revealed that Williams was strangled, beaten and cut. The autopsy also revealed that Williams was pregnant, and that the baby died as a result of Williams' death.[2]

Taylor was identified as a suspect in the murder when police learned that he had a relationship with Williams and that he had been seen in the vicinity of her home on the morning of March 23, 2000. On March 25, 2000 the police received a tip that Taylor was standing at a pay phone on the corner of 9th and Madison Streets. The police responded to the tip and placed Taylor under arrest. Although the arresting officers were aware that Taylor was wanted for questioning in regard to Williams' murder,[3] the purpose for the arrest was an outstanding bench warrant.[4]

At the police station, Taylor was taken to an interview room where Officer Ronald Muniz ("Muniz") began routine inventory procedures. Muniz removed a folded piece of paper from the front pocket of Taylor's hooded sweatshirt and placed it on the table. Shortly thereafter, Detective James Diana ("Diana") entered the room, picked up the piece of paper, opened it and began to read it. He quickly realized that the paper contained a handwritten confession (the "Confession Letter")[5] and there-

---

1. Williams was the single mother of four children. Her two older children were apparently at school during this time.

2. The parties stipulated that Taylor was not the biological father of the fetus removed from Williams' body.

3. A "flyer" had been passed around the station-house with Taylor's picture and a description of the events of March 23, 2000.

4. Initially, Taylor gave the officers a false name. He was taken into custody without incident, however, and apparently said to the officers "you know what this is about, just put the cuffs on me."

5. The confession read in pertinent part:
   My name is Milton E. Taylor, I was born on 11–15–68, my Social Security number is 222–52–1649. I am wanted by the Wilmington police for the murder of Theresa Irene Williams a.k.a. Treety.

fore removed the letter from the other inventoried items so that it could be included as evidence.

The Confession Letter provided the basis for a search warrant for the Victim's car which was found parked on a street in New Castle. Inside the car the police found a thirteen-inch knife wrapped in a bloodstained tee shirt. The blood on the shirt matched the Victim's blood type. During the investigation it became clear that the apparent motive for the murder was that Taylor's current girlfriend had given him an ultimatum: end all contact with Williams or lose the current girlfriend. Taylor had apparently gone to see Williams to end contact with her and killed her in the process. Taylor did not testify at trial, nor did he offer any witnesses.

The trial court instructed the jury on both First and Second Degree Murder, but denied the defense request for an instruction on Manslaughter. On March 31, 2001, the jury found Taylor guilty of First Degree Murder. At the penalty phase, the jury found, by votes of 12 to 0 respectively, the existence of two statutory aggravating factors: that the Victim was pregnant, and that Taylor had previously been convicted of violent felonies. The jury recommended the death penalty by a vote of 10 to 2, and after careful, independent consideration, the trial judge accepted the jury's recommendation and sentenced Taylor to death.

## II.

■ We review "Constitutional claims *de novo* to determine if the trial court committed an error of law." *Fink v. State,* 817 A.2d 781, 788, 2003 Del. LEXIS 92, * 14 (Del.2003) (citing *Seward v. State,* 723

A.2d 365, 375 (Del.1999)). We also review the trial judge's denial of a motion to suppress *de novo* since the factual basis for the claim is undisputed. *Id.* In essence, Taylor argues that by unfolding the Confession Letter and reading it the police exceeded the scope of the inventory search, and thus violated the strictures of the Fourth Amendment which is applicable to the states through the Fourteenth Amendment. Accordingly, Taylor argues that the trial judge erred by admitting the Confession Letter. We disagree.

■ A routine inventory search is a well-defined exception to the warrant requirement, and thus does not violate the United States Constitution. *See Illinois v. Lafayette,* 462 U.S. 640, 643, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) (citing *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976)). In addition to ensuring officer safety, such routine procedures for the inventory of property also protect the police against claims of "theft, vandalism, or negligence[,]" and also ensure that such property will be safe while in police custody. *See generally Colorado v. Bertine,* 479 U.S. 367, 373, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987). Indeed, the United States Supreme Court has held that "it is not 'unreasonable' for police, as part of the routine procedure for incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures." *Lafayette,* 462 U.S. at 648, 103 S.Ct. 2605 (footnote omitted).

As the Superior Court noted, the Wilmington Police Department's detailed writ-

---

I confess that I did kill Treety and left Terrel and her daughter outside because I couldn't hurt either one of them. After I strangled her I stuck a long kitchen knife in her mouth and cut something in her throat.

\* \* \*

The parties stipulated that Taylor wrote the Confession Letter.

ten policies concerning inventory searches provide for the "seizing, cataloging and storing [of] an arrested person's...papers[.]" *State v. Taylor*, 2001 WL 282813, *2, 2001 Del.Super. LEXIS 103, *4 (Mar. 20, 2001). Although these procedures do not expressly provide for the reading of papers seized during a routine inventory search, we conclude that the reading of such papers is necessary to properly catalogue and store the item. Additionally, we agree with the trial judge that the weight of authority permits police officers to read papers they seize during an inventory search. *Id.* at *2 n. 1, 2001 Del.Super. LEXIS at *6 n. 1. Accordingly, we find that the trial judge properly denied the motion to suppress the Confession Letter.

### III.

Based upon the United States Supreme Court decision in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), Taylor challenges the constitutionality of his sentence which was imposed under the 1991 version of Section 4209. We resolved this issue in *Brice v. State*, 815 A.2d 314 (Del.2003), and on the basis of *Brice*, we have rejected challenges similar to those advanced here by Taylor. *See Norcross v. State*, 816 A.2d 757 (Del.2003); *Reyes*, 819 A.2d 305, 2003 Del. LEXIS 170 (Del.2003). We continue to adhere to our decision in *Brice* with regard to the issues raised by *Ring*.

■ At the close of the State's case, the prosecutor read into the record a number of stipulations entered into by the parties. Most important among these—

for purposes of the finding of an aggravating circumstance under Section 4209—was the fact that the Victim was pregnant at the time of her death.[6] Accordingly, this aggravating factor was established, beyond a reasonable doubt, at the guilt phase, and Taylor was not entitled to a separate finding of this aggravating factor at the penalty phase. Indeed, to require the jury to find the existence of a fact *stipulated to by the parties*, would cause unnecessary confusion and could lead to absurd results. The State also submitted evidence at the penalty phase of Taylor's previous convictions of violent felonies in 1994. Just as an aggravating circumstance that is stipulated to by the parties may not produce a different result at the penalty phase, the fact of prior convictions of violent felonies, when submitted to the jury in a reliable format, may not lead to a contrary finding by the jury at the penalty phase.

■ It is important to note that the jury was not instructed that by its verdict at the guilt phase it had established an aggravating circumstance as required by Section 4209. *Cf. Garden v. State*, 815 A.2d 327, 332 (Del.2003) ("The jury was instructed, as required by 11 *Del. C.* § 4209(e)(2), that a statutory aggravating factor had been established by its verdict that the murder was committed during an attempted Robbery First Degree."). Nevertheless, the jury was instructed that when the parties stipulate to the existence of a fact, that fact is established beyond a reasonable doubt.[7] Accordingly, the jury's

---

6. The actual stipulation as read into the record states that: "the defendant is excluded as the biological father of the fetus removed from Theresa Williams." In addition to this stipulation, the autopsy report as testified to by the Medical Examiner revealed that Williams was pregnant.

7. In this instructions to the jury during the penalty phase, the trial judge stated, "I also remind you that the comments of counsel are not evidence but simply argument. *The only exception to this is where the lawyers stipulate or agree that certain evidence is true.*" As previously noted, the parties stipulated that Taylor was not the biological father of the

12 to 0 findings of the aggravating factors in this case satisfy *Ring*, and also satisfy Delaware's unanimity requirement with respect to reasonable doubt. The jury's findings were therefore the functional equivalent of performing its duties in the narrowing phase consistent with *Ring* and the standards announced by this Court in *Brice*.

## IV.

We are called upon by statute to independently review Taylor's sentence in order to determine whether: (1) the evidence supports a finding of at least one statutory aggravating circumstance; (2) the death penalty was imposed arbitrarily or capriciously; or (3) the sentence is disproportionate when compared to similar cases. *See* 11 *Del. C.* § 4209(g)(2); *accord Reyes v. State*, 819 A.2d 305, 317, 2003 Del. LEXIS 170, *31 (Del.2003).

### A.

■ In this case, there is no doubt that the evidence supports the finding of the statutory aggravating circumstances. The parties stipulated that the Victim was pregnant, and Taylor had previously been convicted of various violent felonies. *See* 11 *Del. C.* § 4209(e)(1)(p), (i).

### B.

Furthermore, the imposition of the death penalty in this case was not arbitrary or capricious. After carefully weighing the aggravating and mitigating circumstances, the jury recommended the death penalty by a vote of 10 to 2. Likewise, the trial judge carefully considered the evidence, as well as the jury's recommendation, and sentenced Taylor to death. *See State v. Taylor*, 2001 WL 1456688 (Del.Super. July 5, 2001).

Among the mitigating circumstances considered by the trial judge were that Taylor was most likely abused as a child, that he has family members who love him and will miss him when he is gone, and that he "holds himself responsible for the killing and he attempted an apology" for the murder of Williams. *Id.* at *4. Against these mitigating circumstances, and in addition to the statutory aggravating circumstances noted above, the trial judge considered the brutal nature of the crime, the impact of the murder on the Victim's family, Taylor's "atrocious criminal record" and the unlikelihood of his rehabilitation in prison. *Id.* *2–4.

The trial judge concluded that the aggravating circumstances outweighed the mitigating circumstances, and he imposed the death penalty. Because this finding is "the product of a deliberate, rational and logical deductive process" it is neither arbitrary nor capricious. *Red Dog v. State*, 616 A.2d 298, 310 (Del.1992) (citing *Pennell v. State*, 604 A.2d 1368, 1376 (Del. 1992)).[8]

### C.

Finally, we must compare the imposition of the death penalty in this case to the "universe" of death penalty cases in order

---

fetus removed from the victim's body. The effect of this stipulation was an admission that the victim was in fact pregnant.

8. Taylor argues that his death sentence is invalid because he "waived" his opportunity to present mitigating evidence during the penalty phase of the trial. As discussed above, however, the trial court considered evidence of mitigation, and thus Taylor's argument is unpersuasive. We do not agree with Taylor that "meaningful proportionality review" is impossible because he "waived" his opportunity to offer additional evidence of mitigation.

to ensure[9] the proportionality of the sentence. We have compared Taylor's sentence with other First Degree Murder cases that have proceeded to a death penalty hearing. *See, e.g., Red Dog,* 616 A.2d at 311 (citations omitted).[10] In particular, we "look[ ] to the factual background of relevant cases to determine the proportionality of the sentence imposed." *See, e.g., Clark v. State,* 672 A.2d 1004, 1010 (Del.1996) (citation omitted).[11] After careful review, we determine that imposition of the death penalty in this case is proportionate with the penalties imposed in similar cases.

As with other defendants sentenced to death in Delaware, Taylor was found guilty of the unprovoked, cold-blooded killing of a defenseless person. *E.g. Norcross,* 816 A.2d at 769; *Capano v. State,* 781 A.2d 556, 677 (Del.2001); *Zebroski v. State,* 715 A.2d 75 (Del.1998); *Jackson v. State,* 684 A.2d 745 (Del.1996); *Weeks v. State,* 653 A.2d 266 (Del.1995); *Gattis v. State,* 637 A.2d 808, 823 (Del.1994); *Dawson v. State,* 637 A.2d 57, 68 (Del.1994); *Sullivan v. State,* 636 A.2d 931, 950–951 (Del.1994); *Wright v. State,* 633 A.2d 329, 343 (Del. 1993). Furthermore, this case is similar to other cases where the victim was a current or former lover. *See Capano,* 781 A.2d at 677; *Weeks,* 653 A.2d at 274; *Gattis,* 637 A.2d at 823; *but see Taylor (Antonio) v. State,* 685 A.2d 349 (Del.1996) ("*Antonio Taylor* ").[12] The manner of death inflicted in this case was extremely brutal with the victim being strangled as well as stabbed and left to die under circumstances precluding discovery and the chance of medical assistance. Accordingly, Taylor's case is substantially similar to other cases where the death penalty was imposed, and we therefore hold that the imposition of the death penalty in this case was proportionate.

## V.

After careful review of the record in this matter, we conclude that the imposition of the death penalty in this case is appropriate under Section 4209 of title 11 of the Delaware Code. Therefore, the judgment of the Superior Court sentencing Taylor to death for the murder of Theresa I. Williams is AFFIRMED. Pursuant to Supreme Court Rule 18, the time within which a motion for reargument may be filed in this matter is shortened to seven days from the date of this Opinion.

HARTNETT, Justice (Retired) concurring.

I disagree that it was proper for the jury to have found by less than a unanimous vote that the aggravating circumstances outweighed the mitigating circumstances. *See Ring v. Arizona,* 536 U.S.

---

**9.** Of course, as we often note in our statutory review of death sentences under Section 4209, a "definitive comparison of the 'universe' of cases is almost impossible." *See, e.g., Pennell,* 604 A.2d at 1376.

**10.** "Cases governed by the 1991 amendment to Section 4209 are most persuasive, but earlier cases may still be considered." *Lawrie v. State,* 643 A.2d 1336, 1350 (Del.1994), *cert. denied,* 513 U.S. 1048, 115 S.Ct. 646, 130 L.Ed.2d 551 (1994).

**11.** See Appendix A attached.

**12.** Taylor urges that *Antonio Taylor* is strikingly similar to his case, and thus the imposition of the death penalty in his case is disproportionate. We disagree. The defendant in *Antonio Taylor* was found to have committed the murder under "extreme emotional distress," *Antonio Taylor,* 685 A.2d at 350, whereas here no such argument was made. Although the death penalty may have been warranted in *Antonio Taylor,* the qualitative nature of the aggravating and mitigating circumstances are distinguishable. *See Capano,* 781 A.2d at 678.

584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); Article I § 4 and Article IV § 19 of the Delaware Constitution. However, I recognize that this Court's ruling in *Brice v. State,* 815 A.2d 314 (Del.2003), is binding until set aside, and I therefore concur in the result herein.

### Motion for Reargument.

Pursuant to Supreme Court Rule, Appellant Milton Taylor ("Taylor") filed a motion for reargument on May 7, 2003 from this Court's opinion affirming his death sentence. *Taylor (Milton) v. State,* 2003 Del. LEXIS 262,* (April 30, 2003). Upon review of *Taylor's* motion, we conclude that he is indeed correct that the Court's opinion misconstrues the circumstances surrounding the life sentence imposed in *Taylor (Antonio) v. State,* 685 A.2d 349 (Del.1996) (hereinafter *Antinio Taylor*).

We stated that "[*Antonio Taylor*] was found to have committed the murder under 'extreme emotional distress,' ...whereas here no such argument was made." *Taylor,* 822 A.2d 1058 n. 12, 2003 Del.LEXIS 262,*17 n.12 (emphasis supplied). The portion of *Antonio Taylor* that we relied upon provides in pertinent part: "At trial, Taylor's position was that he had stabbed Young while acting under the influence of extreme emotional distress, which reduced his crime from intentional murder to manslaughter." *Antonio Taylor,* 685 A.2d at 350. In fact, the jury rejected the notion that Antonio Taylor acted under extreme emotional distress, and accordingly convicted him of Murder First Degree. *Id.* at 349.

This distinction does not alter the result in this case. The fact remains that the "qualitative nature" of the mitigating evidence presented in *Antonio Taylor* caused the jury in that case to impose a life sentence. While certain aspects of emotional distress are implicit in both cases because both killings occured in a domestic setting, the mix of mitigating evidence was different here and the jury concluded that it did not outweigh the aggravating factors. Moreover, *Antonio Taylor* is of limited value for comparative purposes because it was a case in which the death penalty was not imposed and thus was not, itself, the subject of a proportionality analysis by this Court. We adhere to our view that the death sentence imposed in this case meets the standard of proportionality. Accordingly, Taylor's motion for reargument is DENIED.