IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, | § | |
| | § | No. 52, 2016 |
| Plaintiff Below-Appellant, | § | |
| | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | ID No. 9904019329 |
| LUIS E. REYES, | § | |
| | § | |
| Defendant Below-Appellee. | § | |
| | § | |
| | § | |

Submitted: November 16, 2016
Decided: January 19, 2017

Before **STRINE**, Chief Justice; **HOLLAND**, **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **REVERSED AND REMANDED FOR SENTENCING**.

Elizabeth R. McFarlan, Esquire (*Argued*), Maria T. Knoll, Esquire, Delaware Department of Justice, Wilmington, Delaware for Appellant.

Patrick J. Collins, Esquire, Collins & Associates, Wilmington, Delaware for Appellee.

**VAUGHN**, Justice:

# I. INTRODUCTION

In 2001, Luis E. Reyes was convicted of two counts of Murder in the First Degree, two counts of Possession of a Firearm During the Commission of a Felony, and two counts of Conspiracy in the First Degree in what came to be known as the Rockford Park Murders. After a penalty hearing, he was sentenced to death. This Court affirmed Reyes' convictions and sentences on direct appeal.[1]

On March 25, 2004, Reyes filed a timely motion for postconviction relief. On January 27, 2016, after a lengthy procedural process, during which the trial judge retired and the postconviction proceeding was assigned to his successor, the Superior Court issued an opinion granting Reyes' motion and vacating his convictions and sentences.[2] The Superior Court found that several errors occurred during the guilt phase of Reyes' trial. It found that Reyes' election not to testify was not a knowing and intelligent decision; that testimony which Reyes had given in a previous case, admitted in the State's case in chief in this case, included inadmissible character evidence and undermined Reyes' decision not to testify; that the trial court's deferral of co-defendant Luis Cabrera's sentencing until after Reyes' trial deprived Reyes of important exculpatory testimony from Cabrera; that the testimony of a State's witness,

---

[1] *Reyes v. State*, 819 A.2d 305, 318 (Del. 2003).
[2] *State v. Reyes*, 2016 WL 358613, at *38 (Del. Super. Ct. Jan. 27, 2016).

Roderick Sterling, was unreliable, inadmissible hearsay; and that the State violated *Brady v. Maryland*[3] by failing to disclose Sterling impeachment evidence. The Superior Court further broadly found that none of the procedural bars of Superior Court Criminal Rule 61(i)(1-4) applied to any of these findings because "there was a miscarriage of justice pursuant to Rule 61(i)(5), [and] . . . reconsideration of otherwise procedurally barred claims is warranted in the interest of justice pursuant to Rule 61(i)(4)."[4]

The Superior Court also found that Reyes' trial attorneys were ineffective for failing to establish that Sterling's testimony was based on hearsay; by failing to call Ivan Galindez as a witness; by failing to request a missing evidence instruction regarding a document called the Sterling Letter; and by failing to offer into evidence statements Cabrera made in an interview with one of Reyes' trial attorneys.

In addition, Reyes contends that his trial attorneys were ineffective in ways not ruled upon by the Superior Court: in not moving *in limine* to obtain a ruling that a prior murder conviction on Reyes' record was not admissible for impeachment under Delaware Rule of Evidence ("DRE") 609(a)(1) if Reyes testified; in not presenting a thorough and accurate objection to a portion of the above-mentioned Reyes' prior

---

[3] 373 U.S. 83 (1963).
[4] *Reyes*, 2016 WL 358613, at *4.

3

testimony in which Reyes admitted to lying to his girlfriend; in failing to request *Brady* material regarding Sterling; and in appellate counsel's failing to raise the Sterling hearsay issue on direct appeal.

The State claims that the Superior Court committed error in all of its rulings. The State also contends that the other ineffective assistance of counsel claims asserted by Reyes are without merit. We have carefully reviewed each of the issues and concluded that the State is correct. For the reasons which follow, the Superior Court's grant of Reyes' postconviction motion is reversed.

## II. FACTS AND PROCEDURAL HISTORY

The facts as they appear in this Court's 2003 opinion on direct appeal, with footnotes omitted, are as follows:

> Reyes, and his co-defendant, Luis Cabrera, were charged with the murders of Vaughn Rowe and Brandon Saunders. The murders occurred on January 20, 1996. The defendants were not arrested until 1999. The cases were severed and the defendants were tried separately. Cabrera went to trial first and was convicted, as charged, and sentenced to death.
>
> Early in the morning of January 21, 1996, the bodies of two teenagers were discovered by a passerby in a wooded section of Rockford Park in Wilmington. The bodies of Vaughn Rowe and Brandon Saunders were in a shallow grave that was covered by a maroon bed sheet. Rowe and Saunders had, according to expert testimony,

4

been killed about twelve to eighteen hours before their bodies were discovered.

Both teens had been shot in the back of the head. Rowe also had internal injuries to his spleen, liver and left kidney as well as facial lacerations. The additional injuries suffered by Rowe were consistent with the repeated use of blunt force. Some of the injuries were inflicted by a belt buckle.

The police recovered several pieces of evidence at the scene including bullets, four small bags of marijuana found in the victim Rowe's clothes, and a watch Rowe was wearing that had a memory bank of telephone numbers. The memory bank listed a telephone number that corresponded with the residence of Luis Cabrera's father.

At the victim Saunders' home, the police also recovered a business card for "ISS Servicesystem, Inc." Handwritten on the card was "434-6154 Big Lou." Both Cabrera and Reyes worked at ISS and some people referred to Cabrera as "Big Louie" and Reyes as "Little Louie."

In March 1996, the police learned that the bullet, which killed Vaughn Rowe, came from a 38-caliber gun. The bullet had certain identifiable markings on it. A year later, in March 1997, police were investigating the unrelated murder of a man named Fundador Otero, who was killed in January 1995. As part of that investigation, the police conducted two searches at Luis Cabrera's father's house. During that search, they found a 38-caliber pistol and a single maroon fitted bed sheet. When the 38-caliber pistol was test fired, the test bullet had markings almost identical to the bullet found in Vaughn Rowe's head.

On or about January 20, 1998, the police interviewed Roderick Sterling, an inmate at Gander Hill prison. Sterling

advised the police that he had overheard Reyes having conversations with Ivan Galindez, who was Sterling's cellmate. At the time of those conversations, Reyes was also incarcerated at the Gander Hill prison, serving a twelve-year sentence for the Otero murder.

Sterling heard Reyes admit to Galindez his involvement in the Saunders-Rowe double murder, along with a man named Luis Cabrera. Sterling testified that he had overheard Reyes tell Galindez that Rowe and Saunders had "shorted" Cabrera on a marijuana deal. Sterling also stated that Reyes said he beat someone with a belt in the basement of a house at "601 something." He also heard Reyes say that a neighbor came down during the beating because there was so much noise coming from the basement.

Sterling heard Reyes recount to Galindez how he and Cabrera decided to take the person they were beating from the basement to a park. The victim was transported in the trunk of a black BMW. Reyes and Cabrera then picked up the second victim so that they could kill both of them at the same time. Sterling heard Reyes say that once he and Cabrera picked up the second victim, they went to Canby Park. Arriving there, they made both of the victims lie on the softball field and shot them. The bodies were then taken to Rockford Park and left there.

At the time of the murders, Cabrera and Reyes lived together at 610 W. 20th Street in a three-story house. Cabrera and Reyes lived on the second floor. The tenant on the first floor was Donna Ashwell. Clavel Clamamont and Maribel Skjefte lived on the third floor.

Following Sterling's interview, the police located the female tenants of Reyes' former apartment building, Donna Ashwell and Maribel Skjefte. Although they were

interviewed two and a half years after the murders, the women remembered a fight in the basement. Donna Ashwell remembered that the fight occurred just a day or two before the two bodies were found in Rockford Park. The women recalled hearing the voices of Luis Cabrera and Luis Reyes during the fight. They also heard the voice of a third person, which they did not recognize.

At trial, both Ashwell and Skjefte testified. Ashwell recalled that on a Saturday night in January 1996, she heard what she described as a fight in the basement of her building. Ashwell also heard an argument. One voice, which sounded like that of Cabrera, asked another person a question. After a negative response to the question, Ashwell heard a metal crashing noise. Ashwell then went to the basement and banged on the door. Reyes came to the door and Ashwell said to him, "Take the fight elsewhere or I'll call the police." Reyes asked her not to do that and told her they would take the fight elsewhere.

Skjefte testified that she went down to the basement shortly after Ashwell did. She stated that Cabrera answered the door and told her they were taking care of some business. Skjefte also heard Reyes' voice. Shortly thereafter, Cabrera came into the first floor foyer. He apologized to the women and said they were leaving.

Several items of physical evidence linked Rowe and Saunders to Cabrera, albeit indirectly. The first item was a watch that Rowe was wearing at the time of his death. That watch had a memory bank of phone numbers, one of which was for a woman. That telephone number was for the Wilmington residence of Luis Cabrera's father, Luis Cabrera, Sr. The second item of evidence was an ISS Servicesystem, Inc. business card found at the Saunders family home. On it was written a telephone number and the

words "Big Lou."  Both Cabrera and Reyes worked at ISS and were known as "Big Louie" and "Little Louie."

On February 3, 1996, shortly after the murders, Cabrera returned Saunders' pager to a Page One store in Wilmington.  The pager was identified as Saunders' by a code number inside it.  Page One does not generally give receipts for returned pagers, however, when Cabrera returned Saunders' pager, he also bought a new one, generating a receipt. Cabrera's name and address appear on the back of the receipt.

Cabrera's estranged wife testified for the State at Reyes' trial.  She stated that they had both worked for a cleaning service that was located on Silverside Road.  The business card with "Big Lou" on it found in Saunders' bedroom had a Silverside Road address.  Cabrera's wife also testified that she had owned a set of bed sheets that were similar to the single maroon sheet that was found covering the victim's bodies.  When she separated from Cabrera, she left the maroon sheets behind for Cabrera. When police searched Mr. Cabrera Sr.'s house, they found a maroon sheet on the floor in a pile of laundry.  Mr. Cabrera Sr. said it was his son's sheet.  Both the sheet found during the search and the one covering the bodies had nearly identical labels.

Another inmate at the Gander Hill prison, Waymond Wright, testified Reyes told him that he had gone to school with Saunders and Rowe.  Wright testified that Reyes told him that after the murder several classmates hugged Reyes. Commenting on this, Reyes told Wright, "if they only knew."  Wright also testified that when Reyes admitted to the murders, he said the victims were "short" on a pound of marijuana.  Wright's testimony about Reyes' account of

8

how the murders were committed was similar to the events attributed to Reyes by Sterling's testimony.[5]

After Reyes filed his initial motion for postconviction relief, amended motions were filed, with the last being filed on October 13, 2009. An evidentiary hearing was conducted by the trial judge over a period of approximately nine days between May 8, 2012 and April 1, 2013. Depositions were taken and made a part of the record. Shortly after the conclusion of the evidentiary hearing, the trial judge retired. As mentioned, the case was then assigned to his successor. Briefing then occurred, and after briefing was completed, the successor judge requested supplemental briefing relating to Reyes' election not to testify, a matter which theretofore had not been an issue. Supplemental briefing was completed on November 23, 2015 and the Superior Court then issued its opinion. This appeal by the State followed.

## III. STANDARD OF REVIEW

We review a Superior Court judge's decision to grant postconviction relief for an abuse of discretion.[6] To the extent the parties raise questions of law or constitutional violations, they will be reviewed *de novo*.[7]

---

[5] *Reyes*, 819 A.2d at 308-10.
[6] *Ploof v. State*, 75 A.3d 840, 851 (Del. 2013); *Norcross v. State*, 36 A.3d 756, 765 (Del. 2011).
[7] *Zebroski v. State*, 12 A.3d 1115, 1119 (Del. 2010).

9

# IV. DISCUSSION

## Reyes' Election Not to Testify

The first ground for relief addressed by the Superior Court relates to Reyes' election not to testify in the guilt phase of his trial. At the conclusion of the defense case in the guilt phase, the trial judge was informed that Reyes elected not to testify. The trial judge engaged Reyes in the following colloquy:

Court:    Mr. Reyes.

Reyes:    Yes.

Court:    Do you mind standing Mr. Reyes? Mr. Reyes, your attorneys have rested your case. Do you understand that?

Reyes:    Yes, sir.

Court:    That means that they have finished presenting any evidence that they wish to present on your behalf. Have you fully consulted with them as far as you're concerned about the evidence which has been presented or not presented?

Reyes:    Yes, I have.

Court:    You're satisfied with the evidence that has been presented and/or not presented at this point?

Reyes:    Yes.

Court:    Okay. Now, Mr. Reyes, obviously you chose not to take the witness stand in connection with the presentation of your case; correct?

Reyes:    Correct.

Court:    Do you understand, of course, that you had a constitutional right to take the witness stand or not take the witness stand?

10

Reyes:   Yes, I do.

Court:   And you chose not to take the witness stand?

Reyes:   That is correct.

Court:   Did you consult with your attorneys about that decision?

Reyes:   Yes, I did.

Court:   Do you understand that they can only advise you, and I'm not asking what their advice is, but whatever their advice was, it is only advice; do you understand that?

Reyes:   Yes, sir.

Court:   And, by that, I mean, do you understand that the decision to take the witness stand or not take the witness stand is yours alone and not your lawyers?

Reyes:   Yes, I do.

Court:   Was it your decision alone not to take the witness stand?

Reyes:   Yes, it was, altogether.

Court:   Were there any threats, promises or other matters made in connection with that decision?

Reyes:   No, sir.

Court:   Do you believe the decision on your part was a voluntary one?

Reyes:   Yes, I do.

Court:   Do you believe that you were adequately, from your perspective, advised about the choices of taking the witness stand or not taking the witness stand?

Reyes:   Yes, I do.

Court:   Do you feel you had sufficient time to talk to your lawyers about the decision to take – to not take the witness stand?

Reyes:   Yes, sir.

11

| Court: | Do you wish to consult with them any further about this decision about not taking the witness stand? |
| --- | --- |
| Reyes: | No, sir. |
| Court: | And, are you satisfied in your mind as you stand there now, having listened to all this case, including the presentation of your evidence over the last few days that you made the correct decision? |
| Reyes: | Yes, I did. |
| Court: | All right.[8] |

Despite this colloquy, the Superior Court in its postconviction opinion ruled that Reyes' decision to waive his right to testify was not a knowing and intelligent waiver of that right. The ruling was based upon a comment which Reyes made during allocution near the end of the penalty phase of his trial. During allocution, Reyes stated:

> I didn't get on the stand during trial because I didn't want what I was presently incarcerated for to come up. I felt that by that coming out, you, the jury, would automatically think I was guilty. Therefore, I chose not to take the stand.[9]

At the time of his trial, Reyes was serving a sentence for Murder in the Second Degree and other offenses arising from the 1995 murder of Fundador Otero, a murder in which Cabrera was also involved. The State presented the Otero murder as an aggravating factor in the penalty phase. In its postconviction opinion, the Superior

---

[8] App. to Appellant's Opening Br. at 93-94.
[9] *Id*. at 135.

12

Court interpreted Reyes' comment during allocution as indicating that he had wanted to testify during the guilt phase to profess his innocence, but decided not to do so in order to avoid having the jury hear of the Otero murder in either the guilt or the penalty phase. Since the commission of a prior murder is something that would be admissible as an aggravating factor as a matter of course in a penalty phase, the Superior Court reasoned that Reyes' decision not to testify at the guilt phase was based on a misunderstanding and that the decision was therefore not knowing and intelligent. Specifically, the Superior Court explained its reasoning as follows:

> While it appears that Reyes understood the right that he waived in waiving his right to testify on his own behalf, Reyes did not understand the consequences of choosing to forego that right. Reyes' explanation to the jury during the sentencing phase of the Reyes Rockford Park Trial that he wanted to testify to profess his innocence during the guilt phase, but did not do so to avoid presentation to the jury about Reyes role in the Otero murder shows that Reyes expectation was that such evidence would not be admitted . . . . In making the decision not to testify, Reyes should have had the opportunity to consider that evidence regarding his involvement in the Otero murder would be admitted during the penalty phase as an aggravating factor.[10]

The State contends that consideration of this issue by the Superior Court in this postconviction proceeding is barred under then existing Superior Court Criminal Rule 61(i)(4) as formerly adjudicated by the trial judge through his colloquy with Reyes at

---

[10] *Reyes*, 2016 WL 358613, at *6.

trial.[11]  We agree.  It is clear from the transcript of the colloquy that the trial court determined that Reyes had fully consulted with his attorneys concerning the evidence which had been presented or not presented on his behalf; that Reyes was satisfied with the evidence that had been presented; that Reyes understood that he had a constitutional right to take the witness stand or not take the witness stand; that Reyes had consulted with his attorneys about his decision not to testify; that Reyes understood that the decision whether to testify or not was his decision and his decision alone; that his attorneys' role was limited to giving him their advice; that the decision whether to testify was, in fact, being made by Reyes himself; that no one had made any threats or promises to Reyes on the matter; that the decision was a voluntary one on Reyes' part; that Reyes believed the advice he had received from his counsel on the matter was adequate; that Reyes had sufficient time to talk to his lawyers about the decision; that Reyes felt no need to talk with his counsel further about the decision; and that Reyes was satisfied that he was making the correct decision.

The natural conclusion to be drawn from this careful and thorough colloquy is that the trial court made a determination, an adjudication, that Reyes' election not to

---

[11] Rule 61(i)(4) read as follows at all times relevant to this case: "Former adjudication.  Any ground for relief that was formerly adjudicated, whether in the proceedings leading to the judgment of conviction, in an appeal, in a postconviction proceeding, or in a federal habeas corpus proceeding, is thereafter barred, unless reconsideration of the claim is warranted in the interest of justice." Super. Ct. Crim. R. 61(i)(4) (2004).

testify was knowing, intelligent and voluntary. Moreover, it is not at all clear in the quoted comment from his allocution that Reyes would have taken the stand in the guilt phase "to profess his innocence"[12] if he had known that the Otero murder would be admitted into evidence at the penalty phase. It appears that he simply gave the jury his reason why he did not testify in the guilt phase, that is, he did not wish to risk that his testifying might make the Otero murder, which, like the one in this case, involved both Cabrera and him, admissible for impeachment or some other purpose at the guilt phase where the jury would determine his guilt or innocence. Reyes never claimed to be under any misapprehension concerning his decision not to testify at any part of his trial through sentencing, his direct appeal, or even in this postconviction proceeding until the Superior Court raised the issue *sua sponte* near the conclusion of the proceeding in that court.

"Generally, the waiver of a constitutional right will be intelligent and voluntary if the defendant is aware of the right in question and the likely consequences of deciding to forego that right."[13] The admission of the Otero murder evidence at the penalty phase was not a consequence of Reyes' decision not to testify in the guilt phase. The careful colloquy which the trial judge conducted with Reyes established

---

[12] *Reyes*, 2016 WL 358613, at *6.
[13] *Davis v. State*, 809 A.2d 565, 569 (Del. 2002).

15

that his election not to testify was a knowing, intelligent and voluntary decision. Since

Reyes' election not to testify was knowing, intelligent and voluntary, the "interest of

justice" exception in Rule 61(i)(4) is not reached.[14]  It was error for the Superior Court

to find that Reyes election not to testify was not knowing, intelligent and voluntary.[15]

Reyes contends that his trial attorneys were ineffective for not moving *in limine*

to obtain a ruling that Reyes' Otero conviction was not admissible for impeachment

purposes under DRE 609(a)(1) so that he would have had the benefit of that ruling in

making his decision whether or not to testify.  He contends that such a motion would

likely have been granted, and he could then testify with the assurance that the Otero

conviction would not be admitted for impeachment during cross-examination.

To prevail on a claim of ineffective assistance of counsel, the defendant must

satisfy the two-prong standard of *Strickland v. Washington*.[16]  This test  requires that

he prove that trial counsel's performance was objectively unreasonable and that the

---

[14] The "miscarriage of justice" relief from the Rule 61 bars does not apply to any claim barred by Rule 61(i)(4). Super. Ct. Crim. R. 61(i)(5).

[15] We also observe that the Superior Court's Rule 61 analysis here, as well as in other aspects of its opinion, was flawed in another way.  The Superior Court applied the Rule 61 exceptions broadly to all of Reyes' claims, without articulating how each exception applied to each claim.  In addition, it took certain claims that Reyes had framed in his post-evidentiary hearing brief as support for ineffective assistance of counsel and transformed them into support for a freefloating assertion of miscarriage of justice at the Reyes trial.  Rule 61 analysis should proceed claim-by-claim, as indicated by the language of the rule.  Super. Ct. Crim. R. 61(i)(2) ("Any ground for relief"); *id*. 61(i)(3) ("Any ground for relief"); *id*. 61(i)(4) ("Any ground for relief"); *see generally Bradley v. State*, 135 A.3d 748 (Del. 2016) (analyzing individual claims for being barred or not barred); *Sykes v. State*, 2015 WL 417514 (Del. 2015) (same).

[16]  466 U.S. 668, 686 (1984).

defendant was prejudiced as a result.[17] Under the first prong, judicial scrutiny is "highly differential."[18] Courts must ignore the "distorting effects of hindsight" and proceed with a "strong presumption" that counsel's conduct was reasonable.[19] The *Strickland* court explained that "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."[20]

Under the second prong, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."[21] In other words, "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding."[22] "Some errors will have a pervasive effect . . . , and some will have had an isolated, trivial effect."[23] The movant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[24] "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[25] The

---

[17] *Id*. at 688, 694.
[18] *Id.* at 689.
[19] *Id*.
[20] *Id*. at 690.
[21] *Id.* at 693.
[22] *Id.*
[23] *Id*. at 695-96.
[24] *Albury v. State*, 551 A.2d 53, 58 (Del. 1988) (quoting *Strickland*, 466 U.S. at 694).
[25] *Strickland*, 466 U.S. at 694.

"court must consider the 'totality of the evidence,' and 'must ask if the [movant] has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.'"[26]

We find that Reyes cannot establish that there is a reasonable probability that the result of his trial would have been different if a motion *in limine* regarding his prior conviction had been filed. The manner in which the trial court would have addressed such a motion involves speculation. A trial court has no obligation to rule upon such a motion before the defendant testifies. The trial court may have deferred the motion until the conclusion of Reyes' direct examination, if he did elect to testify. A trial court generally has the option "to defer ruling on evidentiary issues until the evidence is actually offered for admission."[27] "This is particularly true under Rule 609(a)(1) , which directs the court to weigh the probative value of a prior conviction against the prejudicial effect to the defendant. To perform this balancing, the court must know the precise nature of the defendant's testimony, which is unknowable" until he actually testifies.[28]

---

[26] *Swan v. State*, 28 A.3d 362, 384 (Del. 2011) (quoting *Strickland*, 466 U.S. at 695-96).

[27] *Dawson v. State*, 581 A.2d 1078, 1087 (Del. 1990) (quoting *United States v. Burkhead*, 646 F.2d 1283, 1286 (8th Cir. 1981)).

[28] *Fennell v. State*, 691 A.2d 624, 626 (Del. 1997) (quoting *Luce v. U.S.*, 469 U.S. 38, 41 (1984)).

Even if the trial court had granted a motion *in limine* prior to Reyes' testimony, the ruling would have been subject to change as the evidence unfolded. If Reyes had testified, he would have been subject to vigorous cross-examination concerning his relationship with Cabrera. Whether he might have given an answer that rendered the Otero murder admissible for impeachment or another relevant purpose is speculation. Under these circumstances Reyes has failed to establish prejudice from his trial attorneys' failure to file a motion *in limine* regarding his Otero conviction.

### *Reyes' Prior Testimony*

The next ground for relief addressed by the Superior Court relates to testimony which Reyes gave in the State's case in chief in Cabrera's earlier trial for the Otero murder. This prior testimony was presented during the State's case in chief in the guilt phase of the trial. The specific testimony at issue is:

> Q. Okay. And you don't recall telling your girlfriend that or do you recall telling your girlfriend that you were with Luis and somebody came over to the house and you went down the basement and beat them up?
> A. No. I don't recall telling her that. Not that moment. I told her that another time.
> Q. Another time?
> A. Yes.
> Q. When was that?
> A. When we was at our house.
> Q. So you lied to your girlfriend when you were at your house?
> A. Yes.

Q. And when was that?
A. I couldn't give you an exact date.[29]

The Superior Court in this postconviction proceeding found that this evidence was improper and objectionable. Specifically, the Superior Court stated in its opinion:

> This was improper and objectionable. Although Reyes Trial Counsel objected to the reading in of Reyes prior testimony, the Trial Court permitted Reyes prior testimony to be read to the jury in Reyes Rockford Park Trial. The Trial Court simply explained that the testimony was probative and determined there was no Delaware Rule of Evidence ("DRE") 403 issue that prohibited its admission. However, Reyes former testimony was nevertheless inadmissible hearsay and undermined Reyes choice to invoke his Fifth Amendment right not to testify.
>
> \*   \*   \*
>
> There is nothing in the record to suggest that Reyes Trial Counsel introduced evidence regarding the character trait for truthfulness or untruthfulness for Saunders, Rowe, or Reyes. Further Reyes' testimony that was introduced was neither opinion nor reputation evidence as permitted under the DRE. Instead, it was a specific instance of conduct, which is inadmissible in the form of extrinsic evidence and can only be inquired into on cross-examination. Accordingly, evidence of Reyes' character trait for truthfulness was inadmissible because he was not a witness in the Reyes Rockford Park Trial because he invoked his Fifth Amendment right, and his character for truthfulness was not otherwise attacked. Moreover, even if Reyes' character for truthfulness was at issue, extrinsic evidence – the reading of testimony into evidence and introducing it as an exhibit –

---

[29] App. to Appellant's Opening Br. at 75.

20

was inadmissible under the DRE. Presentation of Reyes' own testimony from a prior proceeding undermined Reyes' decision not to testify as a witness against himself.[30]

The State contends that consideration of this issue by the Superior Court in this postconviction proceeding is barred by Rule 61(i)(4) as formerly adjudicated.

The record reveals that Reyes' trial attorneys strongly objected to the admission of this excerpt from Reyes' testimony at the Otero trial in its entirety. A lengthy sidebar took place in which defense counsel argued that the statement was irrelevant and unfairly prejudicial. They argued that there was nothing in Reyes' reference to a beating in the basement that identified such beating to the Rockford Park murders. Toward the end of the arguments over the admissibility of the statement, defense counsel specifically objected to the line where Reyes said he lied to his girlfriend:

> [Defense Counsel]: So if the Court is now ruling that the evidence about the fight is going to come in, why do we need, what's the point of lines 13 through 17? So you lied to your girlfriend when you were at her house? Lied about what?[31]

The State responded, arguing for the admission of the lines in question as showing that Reyes was initially unwilling to admit he was involved in a fight in the basement. Ultimately, the trial court ruled that the lines would be admitted:

---

[30] *Reyes*, 2016 WL 358613, at *7 (citations omitted).
[31] App. to Appellant's Opening Br. at 73.

21

> Unless someone can show something to me otherwise, considering that the only thing Mr. Reyes says was something about a beating and did not mention any possible events thereafter, that's an inference that a jury can take from that particular series of questions and answers on page 118, lines13 through 17, that he lied to her by not telling her the whole thing.[32]

On his direct appeal, Reyes argued that the first question and answer from his transcript testimony should have been excluded under DRE Rule 403.[33] This Court rejected that argument.[34] On appeal Reyes did not argue against the admissibility of the balance of the testimony.[35]

There is no doubt that the admissibility of Reyes' transcript testimony from the Otero trial was adjudicated by the trial court. The trial court ruled that all the of proffered transcript testimony could be read into evidence over the objection of defense counsel, including the part where Reyes said that he lied to his girl friend.

Reyes contends that his trial counsel exhibited a "lack of vigilance and failure to properly object," and failed to state "a properly grounded objection" to the lines from the transcript in which Reyes said he lied to his girlfriend.[36] However, a

---

[32] *Id*. at 74.

[33] *Reyes*, 819 A.2d at 311.

[34] *Id*. at 311-12.

[35] *Id*.

[36] Appellant's Answering Br. at 35.

"defendant is not entitled to have a court re-examine an issue that has been previously resolved 'simply because the claim is refined or restated.'"[37]

Reconsideration of the admissibility of Reyes' testimony from the Otero trial is barred by Rule 61(i)(4) as formerly adjudicated, unless Reyes can satisfy Rule 61(i)(4)'s "interest of justice" exception.

The "interest of justice" exception in Rule 61(i)(4) applies when the previous ruling was "clearly in error or there has been an important change in circumstances, in particular, the factual basis for the issues previously posed."[38] Here, the trial court was not clearly wrong and there has been no change in circumstances. Therefore, the "interest of justice" exception is unavailing to Reyes.

### *Cabrera's unavailability as a witness*

The next ground for relief addressed by the Superior Court relates to Reyes' co-defendant, Luis Cabrera. Cabrera's trial in the Rockford Park Murders took place before Reyes' trial. Cabrera's trial concluded on February 15, 2001 with his being convicted of two counts of Murder in the First Degree, two counts of Conspiracy in the First Degree, and other offenses. The jury recommended death by an 11-1 vote. The Cabrera trial judge, who was the same trial judge assigned to the Reyes case, deferred

---

[37] Skinner v. State, 607 A.2d 1170, 1172 (Del. 1992) (quoting *Riley v. State*, 585 A.2d 719, 721 (Del. 1990), *abrogated on other grounds by Morgan v. Illinois*, 504 U.S. 719 (1992)).
[38] *Weedon v. State*, 750 A.2d 521, 527 (Del. 2000).

Cabrera's sentencing until after Reyes' trial. Reyes' trial ended October 26, 2001. Cabrera did not testify at Reyes' trial. Cabrera and Reyes were both sentenced on March 14, 2002.

The issues relating to Cabrera appear to begin with a letter which Cabrera's attorney wrote to Cabrera dated March 6, 2001. There had apparently been some talk of Cabrera testifying at Reyes' trial. In his March 6, 2001 letter, however, Cabrera's attorney stated, in part:

> I agree with your decision. I know that you genuinely wish to assist Mr. Reyes in his trial, however, I think that any testimony you give at this point will seriously undermine your chances of success in your appeal, or during any other Postconviction action.
>
> Notwithstanding your decision not to testify, [Mr. Reyes defense attorneys] would like the opportunity to speak with you so you can focus their efforts in defending Mr. Reyes. I personally see no downside to this type of communication . . . Based upon your very clear desire not to testify, however, I have to insist that [defense counsel] keep this discussion "off the record.." Essentially this means that anything you say to them will be used for trial preparation for the Reyes trial, but you will not be asked to testify as to any matters given during this conversation.[39]

The suggested meeting between Cabrera and one of Reyes' trial attorneys did take place, with an investigator present. At the meeting, Cabrera stated that Saunders

---

[39] App. to Appellant's Answering Br. at 1482.

and Rowe were murdered by a person named Neil Walker and that Reyes was not involved. Defense counsel and their investigator made notes of Cabrera's account of the murders. Cabrera had also identified Neil Walker as the killer in a statement he gave to an investigator in 1997.

Next, Cabrera wrote a letter to one of Reyes' attorneys on September 23, 2001 saying that he had been approached by Reyes' mother and that he did "want to help," but not at the expense of admitting his own guilt.[40]

Finally, however, on October 9, 2001 Cabrera's attorney wrote a letter to Reyes' attorneys which stated, in pertinent part:

> I understand my client may have communicated a willingness and desire to testify on behalf of Mr. Reyes.
>
> Notwithstanding these prior communications, my client indicated to me that he did not wish to appear as a witness in the Reyes trial. Moreover, if Mr. Cabrera was called as a witness in the Reyes trial, he would refuse to testify based upon his counsel's advice and based upon his assertion of his Fifth Amendment privileges.[41]

By then, Reyes' trial had already commenced.

---

[40] *Id.* at 1480.
[41] *Id.* at 1481.

On August 29, 2012, at the evidentiary hearing in this postconviction proceeding, Cabrera was called as a witness. Citing "upcoming hearings of my own," Cabrera invoked his Fifth Amendment privilege and refused to answer questions.[42]

The successor Superior Court judge seems to fault her predecessor for deferring Cabrera's sentencing until after Reyes' trial. The Superior Court states in its postconviction opinion:

> Had Cabrera testified as a witness at the Reyes Rockford Park Trial, Cabrera may have introduced reasonable doubt regarding Reyes role in the Rockford Park Murders. Specifically, Reyes Trial Counsel met with Cabrera in March 2001 and Cabrera explained to Reyes Trial Counsel that *Reyes was not responsible for the Rockford Park Murders*, but instead that a man named Neil Walker had committed the murders. Cabrera detailed an altercation that involved Walker, Cabrera, Saunders, and Rowe that gave a motive for Walker to commit the Rockford Park Murders.
>
> However, instead of testifying on behalf of Reyes, Cabrera advised that, if called as a witness in the Reyes Rockford Park Trial, Cabrera would invoke his Fifth Amendment right because he had not yet been sentenced. Accordingly, a critical witness with exculpatory evidence for Reyes was unavailable because of the Trial Court's exercise of discretion as to the timing of Cabrera's sentencing. The Trial Court's delay in sentencing Cabrera rendered Cabrera unavailable as a witness in the Reyes Rockford Park Trial, denying access to exculpatory evidence and undermining the fairness of the trial.[43]

---

[42] *Id*. at 1161.

[43] *Reyes*, 2016 WL 358613, at *8.

26

The Superior Court's reasoning does not identify any legal rule which controls the discretion of a trial judge in scheduling a sentencing, nor are we aware of one. In fact, there is nothing in the record to suggest that the trial judge was even aware of the goings on concerning Cabrera. However, the dispositive point on this issue is that on October 9, 2001, after Reyes' trial had begun, Cabrera's counsel unequivocally informed Reyes' attorneys that Cabrera would not testify at Reyes' trial and, if called, would exercise his Fifth Amendment privilege not to testify. This statement on the part of Cabrera's attorney would seem to be supported by the fact that at the evidentiary hearing in this proceeding Cabrera did invoke his Fifth Amendment privilege, due to his "upcoming hearings."[44] The clear weight of the evidence is that Cabrera would have exercised his right not to testify if called as a witness at Reyes' trial. There was no error on the part of the trial court in deferring Cabrera's sentencing until after Reyes' trial so that they could be sentenced together. The Superior Court's ruling that delaying Cabrera's sentencing deprived Reyes of exculpatory evidence and undermined the fairness of his trial is error.

The Superior Court also ruled that Reyes' trial counsel were ineffective for not attempting to introduce at trial the statement they had received from Cabrera in the interview with him in which he stated that the murders were committed by Neil Walker.

[44] App. to Appellant's Answering Br. at 1161.

The court reasoned that Cabrera's statement was admissible under DRE 804(b)(3). That rule allows statements against interest made by an unavailable witness to be admitted under some circumstances. One element for admissibility is that the statement must be one which "so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true."[45]  Where the statement is one "tending to expose the declarant to criminal liability and offered to exculpate the accused," the statement is "not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."[46]  The extent to which Cabrera's statement tended to expose him to criminal liability seems somewhat arguable.  To the extent that Cabrera's statement did not tend to expose him to criminal liability, it is not admissible under this rule.  To the extent that it did tend to expose him to criminal liability, it would have been offered "to exculpate the accused," Reyes.[47]  Under these circumstances, Cabrera's statement was admissible only if "corroborating circumstances clearly indicate[d] the trustworthiness of the statement."[48]  Reyes contends that there is some independent corroboration of Cabrera's claim, in that

---

[45] D.R.E. 804(b)(3).
[46] *Id*.
[47] *Id*.
[48] *Id*.

28

Cabrera was charged and indicted for physically assaulting Neil Walker in anger that Walker had apparently exposed him to suspicion. However, we do not regard this as corroboration of Cabrera's statement that Neil Walker was the killer. Cabrera's statement was not supported by any corroborating circumstances that clearly indicate the trustworthiness of the statement. Therefore, Cabrera's statement to Reyes' trial attorneys was inadmissible hearsay. Accordingly, Reyes can not establish prejudice from his trial counsel's failure to offer Cabrera's statement into evidence. It was error for the Superior Court to find that Reyes' trial counsel were ineffective for not attempting to introduce Cabrera's statement.

### *Sterling's Testimony*

Roderick Sterling was an important witness against Reyes. As described in the Statement of Facts, Sterling, an inmate at Gander Hill prison, overheard Reyes admit to another inmate, Ivan Galindez, that he, Reyes, was involved in the Rockford Park Murders.

At the time he overheard Reyes speaking with Galindez, Sterling was awaiting trial on two counts of Unlawful Sexual Intercourse in the First Degree. The victim was his seven year old niece. In June 1997, he notified his attorney by letter that he had information about the Rockford Park Murders. On December 1, 1988, Sterling pled guilty to one count of Unlawful Sexual Intercourse in the Second Degree and was

29

sentenced to twenty years at Level V, suspended after ten years, followed by ten years of community probation. After Sterling testified at Reyes' trial, the State joined in a motion to withdraw his guilty plea to Unlawful Sexual Intercourse in the Second Degree. The motion was granted. Sterling then pled guilty to Unlawful Sexual Intercourse in the Third Degree. The State recommended a sentence of ten years at Level V, suspended immediately, with the expectation that Sterling would be deported to Jamaica. The recommended sentence was imposed and Sterling was deported. The Superior Court reasoned that Sterling had received a "huge benefit" for his testimony.[49] It stated that "[t]he benefit offered to Sterling by the State in exchange for Sterling's testimony rendered Sterling's testimony unreliable."[50]

Based upon an interview with Sterling conducted by an investigator in 2008 in Jamaica, Reyes has contended in this postconviction proceeding that Sterling's testimony was actually hearsay. Specifically, he contends that Sterling did not overhear Reyes speaking, and that his testimony was hearsay passed on to him by Galindez. The Superior Court ruled that Sterling's testimony violated Reyes' Sixth Amendment right to confront witnesses. Specifically, the court stated:

> Sterling testified inaccurately at the Reyes Rockford Park
> Trial that Sterling overheard a conversation at HRYCI

---

[49] *Reyes*, 2016 WL 358613, at *9.
[50] *Id*. at *8.

30

between Reyes and Galindez and that, in that conversation, Reyes admitted to Galindez that Reyes killed Saunders and Rowe. In other words, when Sterling testified, he claimed to have personal knowledge regarding Reyes' alleged statements. However, in September 2008 when private investigators interviewed Sterling in Jamaica, Sterling claimed that he learned details of the Rockford Park Murders from Galindez and not from Reyes. Reyes had a Sixth Amendment right to confront the witnesses who testified against him. Because Sterling testified against Reyes and not Galindez, Reyes' Sixth Amendment right was violated.[51]

The interview with Sterling in 2008 was conducted as part of defense preparation during this postconviction proceeding. In the interview, Sterling said that Galindez gave him some details after Sterling overheard the conversation between Reyes and Galindez. He stated that his testimony at trial was some of what he overheard Reyes say and Galindez filled in to give a full explanation. Because of the time which had passed, Sterling did not remember much of the conversation he overheard in 1997. He said the detail of the motive for the killings came from Galindez.

After Reyes' attorneys in the postconviction proceeding received the interview with Sterling, they moved for an order to take Sterling's deposition. In an opinion issued November 13, 2012, the trial judge denied the motion.[52] He compared Reyes'

---

[51] *Id.* at *9.

[52] *State v. Reyes*, 2012 WL 8256131, at *9 (Del. Super. Ct. Nov. 13, 2012).

31

trial testimony and the statement which Reyes had given to the investigator during the 2008 interview. He explained his ruling as follows:

> The Court sees an insufficient basis to authorize Sterling's deposition. First, he professed lack of memory on some things eleven years after the date he overheard Reyes speak to Galindez. Second, while he identified one area–the motive, which he said Galindez gave some detail, that was the one identified. There were a series of details he recited in his 1998 statement and at trial and no basis has been presented to believe those were not things he actually overheard. Third, Sterling did not recant his trial testimony or the 1998 statement. Fourth, a careful reading of the 2008 statement simply makes no compelling case or cause to take his deposition. No glaring changes or inconsistencies appear, and he made no statement that what he said at trial was not truthful.[53]

Reyes' attorneys filed a motion for reargument, in which they argued, among other things, that they should be permitted to take Sterling's deposition to develop potential claims, including Due Process violations.[54] The trial judge denied the motion for reargument.

In her opinion granting Reyes' motion for postconviction relief, the successor judge made no mention of the trial judge's ruling.

The State contends that the trial judge's 2012 ruling formed the law of the case and that the successor judge should not have reconsidered the issue of Sterling's

---

[53] *Id*. at *9.
[54] The Ivan Galindez affidavit, discussed hereinafter, was attached to the motion for reargument.

testimony. We have recently reiterated that a trial court's previous decision in a case will form the law of the case for the issue decided.[55] In *State v. Wright*, we stated:

> It is also established that a trial court's previous decision in a case will form the law of the case for the issue decided. In *Nationwide Emerging Managers, LLC v. Northpoint Holdings, LLC*, a Superior Court judge dismissed a plaintiff's claim that was based on a specific contractual provision. Subsequently, the judge retired and the case was assigned to his successor. The plaintiff renewed the claim. The successor judge rejected the defendant's contention that the law of the case doctrine barred reconsideration of the dismissal, reinstated the claim, and found that the defendant breached the contractual provision. This court reversed, reasoning that under the law of the case, the Superior Court's legal ruling at an earlier stage of the proceedings controls later stages of those proceedings, provided the facts underlying the ruling do not change.[56]

By denying Reyes' motion to take Sterling's deposition and denying the motion for reargument, in which Reyes argued that Sterling's testimony was hearsay passed on from Galindez and that a deposition was necessary to develop potential Due Process claims, the trial court rejected Reyes' hearsay and Sixth Amendment challenges. That ruling forms the law of the case regarding Sterling's testimony unless the ruling is "clearly wrong, produced an injustice or should be revisited because of changed circumstances."[57] The 2012 ruling is not clearly wrong and no circumstances have

---

[55] *State v. Wright*, 131 A.3d 310, 321 (Del. 2016).
[56] *Id*. (citations omitted).
[57] *Hoskins v. State*, 102 A.3d 724, 729 (Del. 2014).

33

changed since the ruling was issued. Furthermore, whether the benefit offered to Sterling by the State in exchange for his testimony rendered his testimony unreliable was for the jury to decide. The successor judge should not have disregarded her predecessor's well-reasoned ruling and revisited Reyes' challenge to Sterling's testimony. Her decision to do so was error.

The Superior Court also ruled that Reyes' trial counsel were ineffective in connection with Sterling's testimony. As mentioned, Sterling first surfaced as claiming to have knowledge of the Rockford Park Murders in a letter which he wrote to his attorney ("the Sterling letter"). At Reyes' trial, Sterling said the letter was written by Galindez but signed by him, Sterling.[58] In ruling that Reyes' trial attorneys were ineffective in connection with Sterling's testimony, the Superior Court stated as follows:

> Sterling sent a letter to his counsel ("Sterling Letter") claiming that Reyes admitted his role in the Rockford Park Murders and Sterling testified about the Sterling Letter at the Reyes Rockford Park Trial. Sterling admitted at the Reyes Rockford Park Trial Galindez wrote the Sterling Letter and that Sterling signed it. At the Reyes Rockford Park Trial, Reyes Trial Counsel objected to Sterling's testimony regarding the Sterling Letter on hearsay grounds. Overruling Reyes Trial Counsel's objection, the Trial Court found that even though Galindez and not Sterling wrote the

[58] There is some dispute about who actually did the writing of the letter and whether Galindez also signed it.

34

Sterling Letter, Sterling adopted the contents of the Sterling Letter and, therefore, testimony regarding the Sterling Letter was admissible under the DRE.

Although Reyes Trial Counsel properly objected to Sterling's testimony about the Sterling letter, Reyes Trial Counsel did not present an accurate and thorough basis for the hearsay objection to the Trial Court. Specifically, even if the Trial Court agreed with the State that Sterling adopted the statements of Galindez by signing the Sterling letter, the letter was hearsay. Particularly, Sterling testified at the Reyes Rockford Park Trial that the information within Sterling's letter was learned by Sterling when Sterling overheard a conversation between Reyes and Galindez. However, in September 2008 when private investigators interviewed Sterling in Jamaica, Sterling stated that he learned details of the Rockford Park Murders from Galindez directly and not by overhearing a conversation between Galindez and Reyes. In other words, even though Sterling claimed at the Reyes Rockford Park Trial that he had personal knowledge of the Sterling letter, Sterling did not have personal knowledge. Accordingly, the Sterling letter was hearsay, but this argument was not presented for the Trial Court's consideration. This failure reflected inadequate trial preparation which was not reasonable performance under the circumstances especially, where, as here, Sterling was the *only* witness to link Reyes to the Rockford Park Murders.

Moreover, Sterling may have signified adoption of Galindez's writing, but adoptive admissions are only considered non-hearsay as to parties. Neither Galindez nor Sterling was a party in the Reyes Rockford Park Trial. Therefore, Reyes Trial Counsel should have presented argument that the Sterling letter was hearsay if it was to be offered for the truth of its contents. Reyes Trial Counsel's

35

failure to make this argument was unreasonable and Reyes has established the performance prong of *Strickland*.[59]

The "Sterling Letter" was not introduced into evidence at trial. The whereabouts of the original are unknown. The contents of the letter are, however, preserved in a verbatim recitation thereof contained in a police report. The letter read as follows:

> I am writing this letter to inform you of some information regarding two bodies found at Rockford Park. The victims were shot, I believe the case is unsolved. Me and my roommate heard a conversation about that – ... check about that. Check out the DA to see if we can make deal. That a visit a letter to notify.[60]

The letter itself seems to have little probative value.

At trial, Reyes' trial attorneys did raise a hearsay objection to Sterling's testimony when Sterling testified that Galindez wrote the letter and he, Sterling, signed it. The trial court overruled the objection on the grounds that Sterling adopted its contents by signing it.

The nature of the framing of the questions posed to Sterling by the prosecutor, and Sterling's responses, are illustrated by the following excerpts taken from the transcript of his testimony:

> Prosecutor: Was-during this time period we are talking about, May, July, on into the fall of 1997, was

[59] *Reyes*, 2016 WL 358613, at *17.
[60] App. to Appellee's Answering Br. at 2383.

36

there ever a time where you heard the defendant talking about the murder which had happened at Rockford Park with Ivan Galindez?

Sterling: Yes, there was.

* * *

Prosecutor: Where you were located, who was there, those kinds of things.

Sterling: Well, him – he was talking to Ivan Galindez, and I happened to have been sitting at the table, in close proximity to where he was talking.

Prosecutor: Were you participating in this conversation yourself or were you simply hearing it?

Sterling: I was overhearing it.

* * *

Prosecutor: Do you remember if he told you how it was that he knew the victims?

Sterling: As I said, he didn't – he wasn't talking to me. He was talking to Galindez. I overheard.

* * *

Prosecutor: What did you overhear the defendant saying about what happened after the person was called over to 601 in the basement? What happened?

Sterling: What I recall is that somewhere along the line, they got into some type of argument and fight, and where this guy was being beaten.

Prosecutor: Where did the beating occur, according to what you heard the defendant say?

Sterling: In the basement of – in the basement.

Prosecutor: Did you overhear the defendant talk about whether there were any weapons involved at the time, down in the basement of 601?

Sterling: The only thing I recall was a belt.

Prosecutor: What do you recall the defendant saying about a belt?

Sterling: Well, that he was beating the individual with the belt.

\* \* \*

Prosecutor: What did you overhear the defendant say about what happened after they got to the area of Canby Park near the softball fields?

Sterling: I'm [sic] gone blank. I'm not recalling. I just recall them – that they drove them into the park and – up by the softball field which is where they were killed.

Prosecutor: All right. So they were killed at the softball fields in Canby Park, right?

Sterling: Yes.

Prosecutor: Where did you get that information from?

Sterling: That's what I heard.

\* \* \*

Sterling: With Cabrera.

Prosecutor: Did the defendants anything [sic] which you heard about how it was the victims were shot?

Sterling: I still don't understand your question.

Prosecutor: All right. Were they standing, sitting, laying down, in the car, outside those kinds of things?

Sterling: Oh, they were outside, laying down on the ground.

Prosecutor: When they were shot?

Sterling: Yes.

Prosecutor: You heard the defendant say that?
Sterling: Yes.[61]

These excerpts clearly illustrate that during direct examination Sterling's testimony was tightly confined to what he said he overheard Reyes saying. There is simply no basis in his testimony to justify a conclusion that Reyes' trial attorneys should have been more vigorous in asserting a hearsay objection or that appellate counsel should have raised the Sterling hearsay issue on appeal. Trial counsel's failure to assert a more vigorous hearsay objection and appellate counsel's failure to raise the issue on appeal were not objectively unreasonable. The Superior Court's ruling that Reyes' trial attorneys were ineffective in not asserting a more vigorous hearsay objection to Sterling's testimony is error.

Next, with regard to Sterling, the Superior Court found that the State violated its *Brady* obligations by failing to disclose impeachment evidence to the defense which related to Sterling's "history of drug and alcohol abuse, convictions, and treatment."[62] Reyes also contends that trial counsel were ineffective for not requesting *Brady* material relating to Sterling.

The *Brady* material which Reyes claims should have been disclosed consists of the following. In his interview with the police, Sterling said he needed "some . . . a

---

[61] App. to Appellee's Answering Br. at 133, 134, 137, 138-39.
[62] *Reyes*, 2016 WL 358613, at *10.

drug rehab program."[63]   When he was sentenced on the charge of Unlawful Sexual

Intercourse in the Second Degree, he made reference in open court to his drug and

alcohol addiction, and his need for a rehabilitation program.  The court included in his

sentence a special condition that he undergo a substance abuse and mental health

evaluation.  The presentence report prepared in connection with his sentencing also

discussed drug and alcohol abuse.

A defendant seeking to establish a *Brady* violation must show (1) that the

evidence at issue must be favorable to the accused, either because it is exculpatory, or

because it is impeaching, (2) that the evidence must have been suppressed by the State,

either willfully or inadvertently, and (3) prejudice must have ensued.[64]  As to the third

element, the defendant must establish that "there is a reasonable probability that, had

the evidence been disclosed to the defense, the result of the proceeding would have

been different."[65]

The police report appears to contain only a reference to Sterling needing a drug

rehab program.  At the evidentiary hearing in this case, Reyes' trial counsel testified

that he may have gotten a copy of Sterling's sentencing transcript.[66]  He also testified

---

[63] App. to Appellee's Answering Br. at 2383-84.
[64] *Starling v. State*, 882 A.2d 747, 756 (Del. 2005).
[65] *Id*. (quoting *Jackson v. State*, 770 A.2d 506, 516 (Del. 2001)).
[66] App. to Appellant's Answering Br. at 687, 688.

that he believed that he had reviewed Sterling's presentence report prior to Sterling's cross-examination.[67]

The jury was made well aware that Sterling had been convicted of committing Unlawful Sexual Intercourse in the Second Degree upon his seven year old niece.[68] The jury was also made aware that, in exchange for his testimony, Sterling had an agreement with the State that would result in the suspension of the balance of a ten year Level V term and allow for his immediate release and deportation to Jamaica. The jury was therefore aware that Sterling received a very substantial benefit from the State for his testimony. On cross-examination, trial counsel also elicited from Sterling that he had been a drug dealer and had used "weed."[69]

Given the significant impeachment evidence which was presented concerning Sterling's conviction, the benefit he was receiving from the State in exchange for his testimony, and his drug dealing and drug use, we think it unlikely that more vigorous cross examination about drug and alcohol abuse would have led to a different result. We conclude that Reyes failed to establish prejudice in connection with impeachment

---

[67] *Id*. at 687.

[68] On direct examination at trial, Sterling also admitted that he was convicted of misdemeanor theft in 1995. App. to Appellee's Answering Br. at 141. That testimony is consistent with the presentence report which was prepared in connection with his sentencing on his conviction of Unlawful Sexual Intercourse in the Second Degree. *Id*. at 2023. Therefore, there were apparently no more convictions for cross-examination.

[69] App. to Appellant's Answering Br. at 150.

41

of Sterling. The Superior Court erred in finding a *Brady* violation. Since we find that Reyes failed to establish prejudice, it unnecessary to address the first and second elements of *Brady*.[70] This finding on our part also disposes of Reyes' claim that trial counsel was ineffective in not specifically asking for drug and alcohol impeachment evidence pertaining to Sterling.

Finally, with respect to Sterling, the Superior Court found that Reyes' trial counsel were ineffective for not requesting a missing evidence instruction with regard to the Sterling Letter. Specifically, the Superior Court ruled as follows:

> The State never produced the Sterling Letter. Importantly, Reyes Trial Counsel did not request a missing evidence instruction for the Sterling Letter. Had Reyes Trial Counsel requested the instruction, the jury would have received the standard *DeBerry* instruction, providing that the jury is to assume the missing evidence is exculpatory for Reyes[.]
>
> * * *
>
> Reyes Trial Counsel's performance fell below an objective standard of reasonableness and Reyes has established the performance prong of *Strickland*[71].

___

[70] The State would have had an opportunity to review Sterling's presentence report in connection with his sentencing, but under the Superior Court's policy of confidentiality of presentence reports, it would not have been proper for the State to make a copy. For this reason, the trial judge refused to consider the contents of the presentence report at the evidentiary hearing. Since we find that the defendant cannot show prejudice from the alleged *Brady* violation, we need not discuss issues regarding disclosure of the presentence report further.

[71] *Reyes*, 2016 WL 358613, at *18.

To determine whether a missing evidence instruction is appropriate, it must first be determined whether the material "would have been subject to disclosure under Superior Court Criminal Rule 16 or under *Brady v. Maryland*."[72] If disclosure was required, it must next be determined "whether the State had a duty to preserve the material" and if so, "whether the State breached that duty and what consequences should flow from that breach."[73] Such consequences are determined by considering the following three factors: "[(i)] the degree of negligence or bad faith involved; [(ii)] the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available; and [(iii)] the sufficiency of the other evidence produced at trial to sustain the conviction."[74] "Where 'the State does not act negligently or in bad faith in failing to preserve evidence, and the missing evidence does not substantially prejudice the defendant's case,' a missing evidence instruction is not necessary."[75]

The Superior Court did not consider these factors in reaching its conclusion. There is no finding, nor, apparently, any evidence of negligence or bad faith on the part of the State. As mentioned, the contents of the letter did not seem to have significant

---

[72] *McCrey v. State*, 2008 WL 187947, at *2 (Del. Jan. 3, 2008).
[73] *Id*.
[74] *Id*. (quoting *Hammond v. State*, 569 A.2d 81, 86 (Del. 1989)).
[75] *Id*. (quoting *Wainer v. State*, 2005 WL 535010, at *3 (Del. Feb. 15, 2005)).

probative value. Although the original of the letter is lost, its contents are known. Under these circumstances, there is no proper basis for giving a missing evidence instruction. Therefore, Reyes failed to establish prejudice from the loss of the "Sterling Letter," and the Superior Court's ruling that his trial attorneys were ineffective in not requesting a missing evidence instruction is error.

**Failure to Call Galindez as a Witness**

The court below also found that trial counsel was ineffective for failing to call Ivan Galindez as a witness at trial because Galindez was the only person who could challenge Sterling's testimony. Specifically, the Superior Court ruled as follows:

> Reyes Trial Counsel was ineffective by failing to call Galindez as a witness. Only Galindez could have challenged Sterling's testimony, which was "the most significant testimony" against Reyes.
>
> Sterling claimed that Sterling overheard and understood conversations between Reyes and Galindez. However, if Galindez had testified, Galindez would have demonstrated that Sterling's claim was false because Sterling could not possibly have understood any conversation between Galindez and Reyes. At trial, Sterling testified that he did not speak Spanish and only understood Spanish "a little bit." Sterling further testified that he heard the conversation between Galindez and Reyes in English. However, in a 2012 affidavit, Galindez provided:
>
> > [] While I was serving my sentence [at Gander Hill], I was on the same pod as Luis Reyes. [] Luis Reyes and I talked about a lot of things

44

> while we were on the same pod. [] When I spoke to Luis Reyes, I spoke to him in Spanish because at the time, I spoke very little English. [] At the time, my cell [mate] was Roderick Sterling. [] Roderick Sterling did not speak Spanish.
>
> Reyes Trial Counsel fell below an objective standard of reasonableness when they failed to call Galindez as a witness. It was critical to challenge Sterling's claim that Sterling heard Reyes tell Galindez that Reyes participated in the Rockford Park Murders. Accordingly, Reyes has established the performance prong of *Strickland*.[76]

Galindez was not called as a witness in this postconviction proceeding and was not subject to cross-examination concerning his affidavit.

At the Cabrera trial where Reyes testified, Reyes stated that he did not understand much Spanish, but understood it "a little bit."[77] Luz Diaz, Reyes' aunt, testified at the evidentiary hearing in this proceeding. Her testimony was that "[W]e speak English to him. He tried to speak to my mom in Spanish, you know, broken Spanish. But, you know, he don't speak very good Spanish. We always kid him. English please."[78]

At the evidentiary hearing, both of Reyes' trial attorneys testified concerning his ability to speak Spanish. One trial attorney testified as follows:

---

[76] *Reyes*, 2016 WL 358613, at *18.
[77] App. to Appellant's Opening Br. at 64.
[78] *Id* at 179.

45

Q. Okay. I believe, and if we need to get the transcripts, we can do that, that Mr. Sterling testified that he overheard Mr. Reyes talking to Ivan Galindez –

A. That sounds familiar.

Q. And it was an issue as to whether that was in English or in Spanish.

A. Okay.

Q. And do you recall that the State presented in rebuttal to that, the State presented some evidence that Mr. Reyes did not know Spanish?

A. I do remember that there was some testimony about Mr. Reyes' ability to speak Spanish and whether or not he ever had conversations in Spanish. And my memory is that it was a bit surprising to me that he didn't.

Q. Okay. Did you speak to any of Mr. Reyes' family members about his ability to speak Spanish?

A. I think we did.

Q. Do you know – do you recall what they told you?

A. Again, my memory is that he was not fluent in Spanish and probably wasn't much better than I was at the time.

Q. And did you ever contemplate having Mr. Reyes tested for his ability to read and understand Spanish?

A. I don't know whether you're asking me did we contemplate that before the trial –

Q. Yes.

46

A.  Well, I don't – I can't sit here and tell you that I know that it was going to be an issue before the trial.  If you're asking me did we ever consider that during the trial, I think that the information that we got from the family members was that that test wasn't going to be helpful.[79]

Reyes' other trial attorney testified as follows:

Q.  What is your understanding of Mr. Reyes' ability to speak Spanish.

A.  I believe it's – he does not speak Spanish very well.  Minimally, I would say.  That's my recollection.

Q.  And obviously every time you spoke to him it was in English; is that correct.

A.  Yes.[80]

The Superior Court did not address any of this admissible evidence, but relied entirely upon Galindez's untested affidavit.

The record clearly establishes that at the time of the trial, Reyes' trial attorneys reasonably believed that he did not speak Spanish.  Reyes' own testimony from the Otero trial and the testimony from Reyes' family at the evidentiary hearing corroborates the trial attorneys' reasonable belief.  Accordingly, the evidence does not establish that Reyes' trial attorneys were objectively unreasonable in not calling Galindez as a witness.  Moreover, calling Galindez, to whom Reyes was alleged to have confessed

---

[79] App. to Appellant's Answering Br. at 689.
[80] *Id*. at 750.

47

by Sterling, may have been a serious mistake. The Superior Court should not have disregarded the admissible evidence that Reyes was not fluent in Spanish in favor of an untested affidavit written eleven years after trial. The Superior Court's ruling that Reyes' trial attorneys were ineffective in not calling Galindez as a witness is error.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the Superior Court is reversed. Reyes' convictions are reinstated. Under our recent decisions of *Rauf v. State*[81] and *Powell v. State*,[82] Reyes' death sentence remains vacated. The matter is remanded to the Superior Court for resentencing on the two convictions of Murder in the First Degree. The Superior Court shall impose on each of the murder convictions a sentence of imprisonment for the remainder of Reyes' natural life without benefit of probation or parole or any other reduction.

---

[81] 145 A.3d 430 (Del. 2016).
[82] 2016 WL 7243546 (Del. Dec. 15, 2016).